FRANK T. NERUD, APPELLEE, V. HAYBUSTER
MANUFACTURING, INC., APPELLANT, AND
BRIDGEPORT EQUIPMENT CO., APPELLEE.
FRANK T. NERUD, APPELLEE, V. HAYBUSTER
MANUFACTURING, INC., AND
BRIDGEPORT EQUIPMENT CO., APPELLANTS.

340 N.W.2d 369

Filed November 10, 1983.  Nos. 82-716, 82-717.

John W. Ballew, Jr., of Raymond, Olsen, Ediger & Ballew, P.C., for appellant Haybuster Manufacturing, Inc.

Wright, Simmons & Selzer, for appellant Bridgeport Equipment Co.

James W. Ellison of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, P.C., for appellee.

WHITE and CAPORALE, JJ., and BRODKEY, J., Retired, and BLUE, D.J., and COLWELL, D.J., Retired.

CAPORALE, J.

These consolidated appeals arise from combined bench trials of suits resulting from the destruction by self-generated fires of two haystacking machines. In the first case the trial court entered judgment in favor of the plaintiff purchaser, Frank T. Nerud, against the defendant manufacturer Haybuster Manufacturing, Inc., and in favor of the other defendant, the seller Bridgeport Equipment Co., on its cross-claim against Haybuster. In the second case the trial court entered judgment in favor of Nerud against both Haybuster and Bridgeport and in favor of Bridgeport on its cross-claim against Haybuster. For the reasons hereinafter discussed we reverse and remand and direct dismissal of the first case, and in the second case we reverse the judgment for Nerud against Haybuster and remand and direct dismissal of the action as between the two of them, but affirm the judgment for Nerud against Bridgeport. No appeal was taken by Haybuster of the judgment against it in favor of Bridgeport.

Nerud, a Morrill County farmer, purchased a "Stack-Eze" model 1800B haystacking machine, manufactured by Haybuster, from Bridgeport in November of 1976. The machine was designed to be towed behind a tractor, collect previously cut plantings, and compact them into 5- to 6-ton haystacks.

On September 6, 1979, while Nerud was using the stacker, a fire broke out near the top of the machine's conveyor. Nerud was unable to douse the fire and the machine was destroyed. On the morning of September 8, 1979, Nerud took delivery of an identical model "Stack-Eze" from Bridgeport. This machine had been used previously to gather about 40 stacks and was therefore sold to Nerud as a demonstrator. Nerud immediately put that machine to its intended use, and by the afternoon of the same day of delivery it too was consumed by fire.

On September 11, 1981, Nerud brought two lawsuits against Haybuster and Bridgeport. In each petition Nerud alleges breach of express and implied warranties, negligent design, construction, and dealer preparation, and strict liability for producing and marketing a defective product. The first suit, case No. 82-716 herein, concerns the first fire, involving the machine purchased in 1976. The second, case No. 82-717, is based on the second conflagration.

Bridgeport cross-claimed against Haybuster for indemnification in both cases.

At trial both Nerud and his expert witness, Richard Crawford, testified that the apparent cause of each fire was the overheating of a bearing on the conveyor shaft, which ignited the hay being gathered. The bearings which failed were in identical locations in each machine. Crawford further testified that the overheating was due to undersized conveyor assembly shafts. The design called for a 1.5-inch shaft to turn within a 1.5-inch bearing. Crawford testified that he measured the shafts on both machines and found them both to measure 1.485 inches, .015 inches undersized. According to him,

the use of undersized shafts caused a high degree of shaft deflection, placing a heavy load on the bearings; as a result, the bearings failed prematurely. The failure of the bearings caused the generation of heat in excess of 1,700° Fahrenheit, up to 2,600° Fahrenheit, resulting in the fires. Crawford testified that other than the undersized shafts, he knew of no other improper assembly.

In the courtroom Haybuster's expert witness, Henry Kucera, measured the two shafts with a micrometer and demonstrated that Crawford's measurements were wrong. The in-court measurements were taken at two points on each shaft. The shaft from the first machine was found to measure 1.500 inches at one end and 1.499 inches at the other. Kucera attributed this .001 undersizing at the latter point to the repair efforts of Nerud, who had admitted using a torch to replace a bearing on this end of the shaft. On the shaft from the second machine, he found it to measure 1.501 and 1.500 on each end. All the in-court measurements taken at points on the shafts which were untouched by Nerud's repair efforts indicated that the shafts were not impermissibly undersized, according to the evidence of industry standards for 1.5-inch shafting introduced by both parties.

The remainder of Nerud's evidence of negligence dealt with the design of the machine. Crawford testified that the haystacker was designed by a trial-and-error method and that since there were no "layout drawings," there was, in essence, no design to the machine. He contended that Haybuster just "assembled a bunch of parts." He did not, however, state in what manner, if any, the method of developing the machine proximately caused the fires.

Crawford also opined that the use of four fixed bearings on the conveyor shaft was a design to be avoided because of the strong potential for bearing overload due to misalignment. Again, however, there was no testimony that the use of the fixed

bearings caused the fires. In fact, the trial judge specifically asked Crawford: "Well, isn't it a fact that because combustible material is so close to the bearing it's causing the problem of why we're here in court today?" Crawford retorted: "No. I think it's because of the high heat that's generated." That is, the high heat was thought by Crawford to have been generated because of the allegedly undersized shafts, which were in fact correctly sized.

The only other evidence in connection with the design of the machine related to the placement and adequacy of certain deflectors at the top of a conveyor belt for the purpose of directing the hay toward the center of the belt away from the bearings. In that regard Kucera was asked (or told) by plaintiff's attorney: "And obviously they [the deflectors] weren't good enough because the fires took place. They could have been better." Kucera replied: "Oh, yes. Everything can be better."

On the basis of the foregoing evidence the trial court found that the machines were "negligently designed in positioning the bearings in such a place that hay ignited when the bearings failed."

The court entered judgment in the first case in favor of Nerud against only Haybuster in the sum of $7,400, plus the costs of suit, on the ground Haybuster was negligent. It dismissed Nerud's warranty claims against Bridgeport, on the ground any warranty claim was barred by the period of limitations.

In the second case the trial court entered judgment in favor of Nerud against both Haybuster, on the ground it was negligent, and Bridgeport, on the ground it breached its implied warranty of merchantability, in the sum of $11,200, plus the costs of suit. It also entered judgment in the same amount in favor of Bridgeport against Haybuster.

Haybuster assigns as its sole operative claim of error the trial court's finding that Haybuster negligently designed the machine. It also asserts the

trial court erred in "rendering judgment" and in "assessing damages" against it, but it does not tell us what that language may be intended to add to its other claim of error. The law is well settled that errors assigned but not argued will generally not be considered on appeal. Neb. Rev. Stat. § 25-1919 (Reissue 1979); *State ex rel. Douglas v. Bigelow*, 214 Neb. 464, 334 N.W.2d 444 (1983); Neb. Ct. R. 9D(1)d (Rev. 1982). Moreover, this court will not consider generalized and vague assertions of error which do not advise us of the issues submitted for decision. *Coyle v. Janssen*, 212 Neb. 785, 326 N.W.2d 44 (1982).

Bridgeport assigns as error the trial court's finding that the fires proximately resulted, in both cases, from a design defect and that, in the second case, its implied warranty of merchantability was breached as well.

It is appropriate to remind ourselves that the findings of a court in a law action in which a jury has been waived have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. In such a circumstance it is not within our province to resolve conflicts in or to weigh the evidence; if there is a conflict in the evidence, this court will review the judgment rendered and will presume that controverted facts were decided in favor of the successful party. *Gregory v. Davis*, 214 Neb. 408, 334 N.W.2d 1 (1983); *Quinn v. Godfather's Investments*, 213 Neb. 665, 330 N.W.2d 921 (1983).

Further, a proper judgment will not be reversed even if the trial court did not give the right reason for its rendition. *Leo A. Daly Co. v. Omaha-Douglas Public Bldg. Comm.*, 212 Neb. 533, 324 N.W.2d 252 (1982); *Jacobberger v. Terry*, 211 Neb. 878, 320 N.W.2d 903 (1982), *supp. op.* 212 Neb. 145, 322 N.W.2d 620 (1982). In other words, in the context of these appeals, the trial court's judgments are to be affirmed if the evidence sustains any theory of recovery pled by the plaintiff, irrespective of which theory the trial court relied upon.

Since the trial court resolved the question of the manufacturer's liability on the basis of its alleged negligence, we begin our analysis from that perspective.

*Morris v. Chrysler Corp.*, 208 Neb. 341, 303 N.W.2d 500 (1981), was an action for the negligent manufacture in 1968 of an automobile purchased and used by the plaintiff in 1975. In late 1976 the engine stopped working because the lower half of a main bearing had not been installed when the engine was manufactured. The purchaser's evidence established that Chrysler had manufactured the engine; that the purchaser was a foreseeable plaintiff in a products liability action under a negligence theory; that the engine was defectively manufactured and placed on the market; and that, as a direct result of the defect, the purchaser incurred damages. We stated that although negligence is never presumed, it is a question of fact which may be proved by circumstantial evidence. We then held that because of Chrysler's failure to rebut the inference of negligence arising from the fact a part of the bearing was missing, the purchaser had sustained his burden of proof and was entitled to recover his damages.

*Morris*, however, is distinguishable from the cases at hand. *Morris* presented a manufacturing defect. These cases do not.

In products liability litigation the notion of a defective product embraces two separate concepts. The first, commonly labeled a manufacturing defect, is one in which the product differs from the specifications and plan of the manufacturer. This concept of defect was relied upon by Nerud at trial. His central effort was to show that Haybuster's specifications required the use of a 1.5-inch shaft, when in fact a smaller one was installed. This claim did not prove to be the fact. Nerud therefore failed to prove a manufacturing defect and consequently does not come within *Morris*.

The second concept of a defective product is one

in which the product meets the specifications of the manufacturer but the product nonetheless poses an unreasonable risk of danger. This condition is generally characterized as a design defect. Restatement (Second) of Torts § 398 at 336 (1965) embodies this second concept of defectiveness. "A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a *safe plan or design.*" (Emphasis supplied.)

While a particular design may pose such an unreasonable risk of danger, liability for this danger differs, depending upon the theory of recovery presented by the plaintiff. In his petition Nerud alleged both manufacturing defects and design defects under both negligence and strict liability theories.

In a strict liability cause of action it is generally proposed that the focus of the court's inquiry should be on the product itself and not the manufacturer. Thus, a finding that the product poses an unreasonable risk of danger is sufficient. (A further discussion follows later in this opinion in our analysis of the strict liability aspects of these cases.) In an. action based upon a negligent adoption of a defective design, however, the plaintiff must additionally show that the manufacturer breached its usual duty to act reasonably in adopting a particular design.

The question of whether a design is defective under the negligence theory, then, refines itself into an inquiry aimed at determining whether the machines involved here presented unreasonable risks of danger *and* whether Haybuster failed to exercise reasonable care in adopting its design.

"Proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed·differently is insuf-

ficient to establish a breach of the manufacturer's or seller's duty as to the design of the product." 2 R. Hursh & H. Bailey, American Law of Products Liability § 9:17 at 301 (1974).

While we have not heretofore specifically adopted a rule requiring the plaintiff in a negligent design case to demonstrate how the defectively designed product could be made safer, and while there is a paucity of precedent on this question in Nebraska, such a requirement is hinted at in *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979), a suit involving both negligence and strict liability theories. We sustained therein a jury verdict in favor of the estate of a truckdriver whose tractor was rendered unsteerable after its bumper was bent into a front wheel as the result of striking a deer. The defendant contended that the plaintiff's evidence failed to show it had not complied with the state of the art in designing the bumper. This court responded: "The question therefore is not whether anyone else was doing more, although that may be considered, but whether the evidence disclosed that anything more could reasonably and economically be done. Northwest Airlines v. Glenn L. Martin Company, 224 F.2d 120 (6th Cir., 1955); Whistle Bottling Co. v. Searson, 207 Ala. 387, 92 So. 657; Restatement, Torts 2d, § 298, p. 68. Plaintiff tendered evidence that there were alternatives which could be used and which, if used, would have prevented the enhanced injury. There was evidence that Paccar was using some of the alternatives itself and that both the material and the knowledge to design a safer alternative existed. That evidence included the use of a shorter bumper, a breakaway bumper, or a stronger bumper, all of which could have been designed in 1969. The jury was not required to accept any of those suggestions. Nevertheless, those were questions of fact which the jury had to resolve." *Id.* at 480, 283 N.W.2d at 35.

In the proper application of a risk versus utility analysis to a negligent design case, one of the fac-

tors which must be weighed is the feasibility of eliminating the risk and the existence of practicable alternative designs. Otherwise, the manufacturer is, in essence, being treated as an insurer of his product's safety. *Friedrich v. Anderson*, 191 Neb. 724, 217 N.W.2d 831 (1974). See, also, *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033 (1974); *Wilson v. Piper Aircraft Corporation*, 282 Or. 61, 577 P.2d 1322 (1978).

We can find, and are directed to, no reference in the record to any alternative design that Haybuster could have adopted, other than Kucera's cryptic remark on cross-examination that the hay deflector, like everything else, could have been designed better. Absent evidence that the risk could have been avoided by adopting a reasonable alternative design, Nerud's case in negligence based upon a defective design must fail. His effort to establish a manufacturing defect by virtue of undersized shafts also must, as we have seen, fail. We therefore conclude the trial court was clearly wrong in finding Haybuster negligent.

We next turn our attention to the strict liability issues presented by these cases.

Following the trial court's judgments herein, we decided *National Crane Corp. v. Ohio Steel Tube Co.*, 213 Neb. 782, 332 N.W.2d 39 (1983). Therein, we denied recovery for the cost of retrofitting cranes manufactured by the purchaser of defective component parts. In doing so we disapproved *Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643 (1973), to the extent it held that strict liability in tort might not be used to recover for physical harm to property only. In *National Crane* we said: "A majority of courts that have considered the applicability of strict liability to recover damages to the defective product itself have permitted use of the doctrine, at least where the damage occurred as a result of a sudden, violent event and not as a result of an inherent defect that reduced the

property's value without inflicting physical harm to the product. [Citation omitted.]" *Id.* at 789, 332 N.W.2d at 43.

Assuming, but not deciding, that Nerud is entitled to proceed under a strict liability in tort theory under the above-cited *National Crane* language, we nonetheless encounter an obstacle to his recovery.

Restatement (Second) of Torts § 402A at 347-48 (1965) in relevant part provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property . . . ."

This court has defined the term "unreasonably dangerous" to mean that the product has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979).

We have not, however, had an opportunity to define the term "defective condition." We are mindful that the definition of a design defect is one with which courts and commentators have grappled for years. See, e.g., *Barker v. Lull Engineering Co.*, 20 Cal. 3d 413, 573 P.2d 443, 143 Cal. Rptr. 225 (1978); *Cronin v. J.B.E. Olson Corp.*, 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972); Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825 (1973). Our review of the cases has led us to the conclusion that a plaintiff, in order to prove that a particular product is defective in its design, must show that there was some practicable way in which the product could have been made safer. See cases cited in 2 R. Hursh & H. Bailey, American Law of Products Liability § 9:17 at 302 et seq. (1974); *Int'l Harvester Corp. v. Hardin*, 264 Ark. 717, 574 S.W.2d 260 (1978); *Wilson v. Piper Aircraft Corporation*,

*supra.* As such, Nerud has failed to show that the haystackers in question were defective. Absent such a showing, his recovery under a strict liability theory cannot be successful.

Lastly, we turn to Nerud's warranty contentions. In the trial court Nerud conceded that any warranty claims based on the failure of the first machine were barred by the statute of limitations found in Neb. U.C.C. § 2-725(1) (Reissue 1980).

In the case involving the second machine the trial court found that the implied warranty of merchantability given by Bridgeport had been breached when it tendered delivery of the machine to Nerud.

Neb. U.C.C. § 2-314 (Reissue 1980) provides in relevant part: "(1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . . (2) Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used. . . ." There is no question but that Bridgeport is a merchant; that is, one who deals in goods of the kind involved in the transactions under consideration. Neb. U.C.C. § 2-104 (Reissue 1980). Neither do we find any indication that Bridgeport disclaimed its warranty obligations pursuant to the provisions of Neb. U.C.C. § 2-316 (Reissue 1980). The inquiry, then, is whether the machine in question was merchantable.

In *Christensen v. Eastern Nebraska Equipment Co., Inc.*, 199 Neb. 741, 261 N.W.2d 367 (1978), the plaintiff had purchased a tank in which to store liquid fertilizer. Ten days after filling the tank the plaintiff noticed it was leaking and notified the defendant seller. Although the defendant manufacturer replaced the tank, the plaintiff brought suit for his consequential damages. We found that a leaky tank was not suitable for the purpose of storing fertilizer and that the implied warranty of merchantability contained in § 2-314(2)(c) was breached.

In accord with that case a haystacking machine which will only stack hay for a half day before consuming itself in flames is not suitable for the ordinary purposes for which haystacking machines are sold. As such, Bridgeport breached its implied warranty of merchantability to Nerud.

CASE NO. 82-716 REVERSED AND REMANDED FOR DISMISSAL.

CASE NO. 82-717 AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR DISMISSAL.