Robert KALLIO, Respondent,

v.

FORD MOTOR COMPANY, Petitioner, Appellant,

Tomahawk Ford, Inc., Defendant.

No. C4–85–2126.

Supreme Court of Minnesota.

June 5, 1987.

Hildy Bowbeer, Minneapolis, John M. Thomas, Office of Gen. Counsel, Dearborn, Mich., for appellant.

Robert R. Johnson, Minneapolis, for respondent.

Karen Melling van Vliet, Minneapolis, MN Trial Lawyers Ass'n, William E. Jepsen, St. Paul, amicus for MN Defense Lawyers Assoc.

KELLEY, Justice.

In this products liability personal injury action, respondent Robert Kallio claims that a pickup truck owned by him and manufactured by appellant Ford Motor Co. (Ford) was defective due to (1) improper design of the automatic transmission shifting mechanism, and (2) failure to provide adequate warnings of potential danger

arising from operator misuse. On appeal to the court of appeals from a judgment entered in respondent's favor, Ford claimed that the trial court erred in (1) denying Ford's requested instruction that in product design cases the plaintiff has the burden of showing a feasible safer alternative design to establish a prima facie case; (2) in permitting respondent to introduce evidence of subsequent remedial measures; and (3) in failing to direct a verdict, or to give Ford's requested instructions, on the duty to warn. A panel of the court of appeals rejected Ford's assertions.[1] We concur in the result reached by the courts below and, therefore, affirm the judgment. We do not concur, in part at least, however, with the analysis employed by the court of appeals panel.

While driving his 1977 Ford F-150 pickup truck home from work, Robert Kallio pulled over to the side of the road, shifted the automatic transmission lever into the "park" position, and left the cab to cover some tools in the open truck bed that had become exposed to the rain. He neither shut off the engine nor set the parking brake. As he jumped on the bumper to cover the tools, he suddenly realized the truck was moving in reverse. He leaped to the ground and ran to the truck's cab, but before he was able to re-enter the truck, he slipped on the pavement, fell, and the truck ran over both of his legs and one of his hands before a passenger sitting in the cab succeeded in stopping it. His subsequent action against Ford was bottomed on allegations of defective design of the truck's shifting mechanism and on Ford's failure to warn of the propensity of the truck not to go completely into the "park" position. The jury concluded both that the truck was defective[2] and that Kallio was negligent.[3]

1. Because it claims that Kallio failed to demonstrate the existence of a feasible, practicable, and safer alternative automatic transmission shift design, Ford asserts the trial court erred in denying Ford's motion for a directed verdict. Alternatively, Ford argues the trial court erroneously refused to give Ford's requested Instruction No. 11 relating to the issue.[4]

■ Whether the trial court erred in either case depends upon whether in a products liability alleged design defect case a plaintiff must establish as an element of his case that at the time of manufacture a safer, practicable, and technologically feasible alternative design existed—an issue of first impression for this court. Other

1. *Kallio v. Ford Motor Co.,* 391 N.W.2d 860 (Minn.App.1986)

2. The jury was not asked to separately determine whether the "defect" was a design defect or a failure to give adequate warning. Specifically, the interrogatory read, "Was the 1977 Ford pickup defective and unreasonably dangerous to users, with respect to the Park System?" In cases asserting product liability claims, usually it is preferable that trial courts submit a separate interrogatory on each theory. Doing so will not only have the tendency to concentrate jury deliberations on the party's contentions with respect to each issue, but also will afford an appellate court a better framework within which to examine claims of alleged improper instructions, evidentiary rulings, and sufficiency of the evidence. *See, e.g., Bilotta v. Kelley Co.,* 346 N.W.2d 616, 626–27 (Minn.1984) (Simonett, J., concurring).

3. The jury assessed Kallio's damages to be $150,-000. Because it had found Kallio 15 percent at fault, judgment was entered for $127,500.

4. Defendant's requested Instruction No. 11 reads:

PLAINTIFF REQUIRED TO ESTABLISH THE AVAILABILITY OF A FEASIBLE, PRACTICABLE ALTERNATIVE

For you to conclude that the design of the park system in the subject Ford vehicle was defective and unreasonably dangerous at the time of sale by Ford Motor Company, the plaintiff must establish by a preponderance of the evidence that, at the time the vehicle was designed, there was available to the defendant a feasible practicable alternative design and that that design, if it had been chosen by Ford, would have avoided or materially reduced the plaintiff's injury. If the plaintiffs fail to prove the existence of such a feasible, practicable alternative design, they will be unable to prove that Ford's choice of design was unreasonable. The plaintiff cannot carry his burden in this regard merely by showing that an alternative design was possible. To succeed in this case the plaintiffs must establish that such a design would have been feasible and practicable, and that it would have avoided or materially reduced the plaintiff's injury.

courts of last resort, however, have addressed the issue. Ford buttresses its contention by reliance upon decisions from New York, Oregon, and Nebraska—all of which hold that in an alleged defective product design case, an element of plaintiff's case includes proof of the existence of a feasible, safer alternative design. These jurisdictions hold that initially the plaintiff has the onus of presenting evidence of the existence of substantial likelihood of harm and that when the product was manufactured, it was feasible to employ an alternative safer design. *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983); *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 577 P.2d 1322 (1978) *rehearing denied*, 282 Or. 411, 579 P.2d 1287 (1978); *Nerud v. Haybuster Mfg., Inc.*, 215 Neb. 604, 340 N.W.2d 369 (1983). This showing must be more than a "technical possibility [of the existence] of a safer design." *Piper Aircraft*, 282 Or. at 67–68, 577 P.2d at 1326.

The rule of strict liability in tort found in *Restatement (Second) of Torts* § 402(A) (1965) had its genesis more than 20 years ago. Almost since the rule's inception, courts have tended to borrow common law concepts of negligence in determining whether a manufactured product, as designed, is unreasonably dangerous. *See, e.g.,* Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5, 17 (1965); *see also* Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30 (1973); Steenson, *The Anatomy of Products Liability in Minnesota*, 6 Wm. Mitchell L.Rev. 1, 23–25 (1980); Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825 (1973).

The design defect products liability cases arising in the three jurisdictions relied upon by Ford employ the negligence reasonable care test which requires the trier of fact to balance the product's risks against its utility and cost in determining whether it has been defectively designed. *See, e.g., Micallef v. Miehle Co.*, 39 N.Y.2d 376, 386, 384

N.Y.S.2d 115, 121, 348 N.E.2d 571, 577–78 (1976); *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 66, 577 P.2d 1322, 1325–26 (1978); *Nerud v. Haybuster Mfg., Inc.*, 215 Neb. at 614, 340 N.W.2d at 375. We have likewise adopted a similar approach citing with approval *Micallef v. Miehle Co.* in *Holm v. Sponco Manufacturing, Inc.*, 324 N.W.2d 207, 212 (Minn.1982).[5] Later, in *Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn.1984), we reaffirmed our *Holm* holding that we had adopted the reasonable care balancing test. *Id.* at 622. Because this court in *Holm v. Sponco Manufacturing, Inc.* and in *Bilotta v. Kelley Co.* specifically adopted the reasonable care balancing test in design cases in reliance upon the analysis of the New York Court of Appeals in *Micallef v. Miehle Co.*, Ford here argues that we should likewise extend the reasonable care balancing test reasoning, as New York has done, to require preliminarily that a plaintiff must present evidence of the existence of a safer, feasible alternative design. On the other hand, Kallio urges that we should follow *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978), which held that the burden of proving the nonexistence of a safer design should rest with the manufacturer.

We decline respondent's invitation to follow *Barker*. Instead, we concur in the observation made by the Oregon Supreme Court when, in the course of denying a petition for rehearing in *Wilson v. Piper Aircraft Corp.*, urging it to adopt the *Barker* rationale, it stated:

> Under that decision [*Barker*] it appears that a design defect case will always go to the jury if only the plaintiff can show that the product caused the injury. In this jurisdiction, however, it is part of plaintiff's case to show that a product which caused an injury was dangerously defective.

282 Or. at 413, 579 P.2d at 1287–88.

Unlike California, which in *Barker* specifically removed "unreasonable" as a limi-

---

5. The four members of the court joining Justice Simonett's concurrence and dissent in *Holm* concurred with the majority's holding in this respect, but only dissented because the dissenters felt that on the facts of that case submission of strict liability offered nothing "but confusion to jurors and that only the negligence claim is to be submitted to the jury." *Holm*, 324 N.W.2d at 216.

tation of the compensable dangerousness of a product, *see* 20 Cal.3d at 417, 573 P.2d at 446, 143 Cal.Rptr. at 228, Minnesota, like Oregon, maintains the requirement in a strict liability products case that a plaintiff must establish not only that the product was in a defective condition, but also that it was *unreasonably dangerous.* *O'Laughlin v. Minnesota Natural Gas Co.,* 253 N.W.2d 826, 832 (1977), *Bilotta v. Kelley Co.,* 346 N.W.2d at 622. Obviously, a factor bearing upon the latter requirement will be the existence or nonexistence of a feasible alternative design. To satisfy that requirement, the plaintiff ordinarily has the burden of showing the existence of an alternative design that was safer.[6] If the manufacturer presents evidence disputing the contention, the trier of fact will resolve the "unreasonably dangerous" issue. As in other tort cases, plaintiffs asserting a strict liability tort claim based upon alleged defective design of a product ultimately have the burden to prove the elements of the asserted claim. Generally in a case based upon alleged improper design, one of those elements requires production of evidence that the design employed was unreasonably dangerous. To establish a prima facie case that it was unreasonably danger-

ous normally requires production of evidence of the existence of a feasible, alternative safer design.

In this case the trial court instructed the jury using JIG 117, 4 Minn.Dist. Judges Ass'n, *Minnesota Practice,* JIG III CIVIL (3d ed. 1986).[7] Additionally the court's instructions elaborated on other factors the jury could consider in deciding whether Ford's automatic transmission as designed was unreasonably dangerous. Included among those additional factors, the jury was informed it could consider the "state of the art" and the "practices of the automotive industry" at the time of the truck's sale. The tenor, if not the literal wording, of the instructions permitted the jury to consider availability of, and failure to use, an alternative, safer design as a factor. However, Ford complains the instructions didn't go far enough; that they should have informed the jury that plaintiff had the burden to prove the existence of a safer, feasible alternative design as an element of an alleged defective product design case. We disagree. The court's instruction correctly stated the law. *See, e.g., Bilotta v. Kelley Co.,* 346 N.W.2d at 621–22. Although normally evidence of a safer alternative design will be presented initially

---

**6.** Examination of our cases in which plaintiffs have asserted liability of a manufacturer based upon alleged defective design demonstrates that, as a practical matter, successful plaintiffs, almost without fail, introduce evidence of an alternative safer design. *See, e.g., Bilotta v. Kelley Co.,* 346 N.W.2d 616 (Minn.1984) (plaintiff presented evidence of manufacturer's actual alternative design of dockboard); *Hudson v. Snyder Body, Inc.,* 326 N.W.2d 149 (Minn.1982) (plaintiff presented evidence that a portion of the release mechanism of a hydraulic bed dumptruck was superfluously long creating the defect); *Busch v. Busch Constr., Inc.,* 262 N.W.2d 377 (Minn.1977) (plaintiff presented evidence that a turn signal's use of a plastic yoke inside of a locking steering column required a design allowing a greater clearance radius than the manufacturer's design had allowed); *McCormack v. Hankscraft Co.,* 278 Minn. 322, 154 N.W.2d 488 (1967) (plaintiff presented evidence that the cover of a vaporizer should have been secured such that it would prevent water in the vaporizer's jar from simultaneously discharging if the vaporizer should tip over).

**7.** JIG 117 reads:

STRICT LIABILITY—DESIGN DEFECT

A manufacturer has a duty to use reasonable care when designing a product, so as to avoid any unreasonable risk of harm to (anyone who) (property that) is likely to be exposed to harm when the product is put to its intended use or to any use that is unintended but is reasonably foreseeable.

What constitutes reasonable care will vary with the surrounding circumstances. Reasonable care is the care that a reasonably prudent person would exercise under the same or similar circumstances.

The reasonable care to be exercised by a manufacturer when designing a product will depend on all the facts and circumstances, including, among others, the likelihood and seriousness of harm against the feasibility and burden of any precautions which would be effective to avoid the harm. You are instructed that the manufacturer is obligated to keep informed of scientific knowledge and discoveries in its field.

If the manufacturer did not use reasonable care when designing the product in question, then the product is in a defective condition unreasonably dangerous to the (user or consumer) (user's or consumer's property).

by the plaintiff, it is not necessarily required in all cases.[8] Such evidence is relevant to, and certainly may be an important factor in, the determination of whether the product was unreasonably defective. However, existence of a safer, practical alternative design is not an element of an alleged defective product design prima facie case.

Defendant's requested Instruction No. 11 is overly broad, not only because, in essence, it tends to elevate proof of the existence of a feasible alternative safer design from a factor properly for jury consideration to an element of the plaintiff's claim, but also because it tended to overemphasize that factor. As we have stated, such emphasis "is properly the function of counsel in closing argument, not by the court in its instructions." *Alholm v. Wilt*, 394 N.W.2d 488, 491 (Minn.1986). We note that counsel, indeed, made a vigorous final summation arguing Ford's position.

█ Finally, respondent did present some evidence, albeit weak, that a practical safer design was feasible through the testimony of William Barr and Michael Inden.[9] Ford offered considerable evidence that, if believed, would permit the jury to conclude that, indeed, Ford had employed the state of the art in designing the transmission and that no safer practical design existed in 1977. Had we been jurors, we might have accepted Ford's position. However, the resolution of this disputed fact issue was for the trier of fact—here the jury.

Sufficient evidence existed to support the conclusion it reached.

2. Ford next asserts the trial court erred in admitting evidence of subsequent remedial measures that Ford had taken to address the transmission problem. Prior to trial, Ford's motion *in limine* seeking to exclude evidence of design modifications made in 1980 was denied. Likewise, the trial court refused to exclude a 1981 letter to Ford owners issued by the company reminding the owners of the proper procedures to follow in parking Ford vehicles containing automatic transmissions. The court of appeals panel sustained the trial court. Relying exclusively on prior decision of the court of appeals in *Dahlbeck v. DICO Co.*, 355 N.W.2d 157, 165 (Minn.App. 1984), the panel held that Rule 407 of the Minnesota Rules of Evidence prohibiting evidence of subsequent remedial actions is inapplicable in a strict liability tort case.[10]

Generally, Rule 407 precludes admission of subsequent remedial measures to "prove negligence or culpable fault" in connection with the happening of the event giving rise to the injured party's claim.[11] The comments of the Advisory Committee on the Rules of Evidence indicate that the committee took no position on whether the rule's prohibition applies in a strict products liability case. In both *Dahlbeck v. DICO Co.*, and in this case, the court of appeals relied on *Ault v. International Harvester Co.*, 13 Cal.3d 113, 117 Cal.Rptr. 812, 528 P.2d 1148 (1975). We decline to follow *Ault*.[12] Ini-

8. Conceivably, rare cases may exist where the product may be judged unreasonably dangerous because it should be removed from the market rather than be redesigned. *See, e.g., Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 71 n. 5, 577 P.2d 1322, 1328 n. 5 (1978); *O'Brien v. Muskin Corp.*, 94 N.J. 169, 185, 463 A.2d 298, 306 (1983).

9. Ford correctly asserts that some of Inden's testimony was hearsay. However, by failing to properly object to it at the time it was offered, by delaying to move to strike until after Inden was no longer available, and by failing to raise the issue in the court of appeals, it is now too late for Ford to assert the issue before this court.

10. Apparently the court of appeals both in *Dahlbeck* and this case believed that in a products design case, negligence was not an issue. *See,*

*e.g., Kallio v. Ford Motor Co.*, 391 N.W.2d 860, 865 n. 1 (Minn.App.1986).

11. **Rule 407. Subsequent Remedial Measures**
 When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

12. We note that although the United States Eighth Circuit Court of Appeals generally follows *Ault, see, e.g., Robbins v. Farmers Union Grain Terminal Ass'n*, 552 F.2d 788, 793 (8th

tially, it is not clear whether *Ault*, in fact, could properly be considered a conscious design case because the plaintiff in *Ault* principally relied upon metal fatigue as being the cause of the accident giving rise to his injuries, although concededly some of the plaintiff's experts contended that a different type of metal would have been less likely to fail under the circumstances existing. Secondly, we are unpersuaded by the rationale of the majority in *Ault* that evidence of subsequent remedial actions is never barred in a products liability case. In Minnesota we have clearly concluded that the analysis necessary for a trier of fact to resolve whether a given product is unreasonably dangerous is substantially similar to the analysis employed in determining whether negligence exists. *See, e.g., Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn.1984). As previously noted, California courts have not adopted that position. At least in strict liability tort cases alleging design defects, we perceive of no reason why the same public policy considerations that underly the common law rule excluding evidence of subsequent remedial actions in negligence cases, now a part of Rule 407, Minn.R.Evid., are not equally applicable in alleged design defect cases. Better protection is afforded the public by encouraging manufacturers to pursue actions to correct perceived design flaws without fear that the corrections will be used by plaintiffs to raise the inference that the manufacturer has admitted the product's defect by altering the product.

 However, evidence of subsequent remedial actions taken by manufacturers in design defect cases is only inadmissible if the manufacturer concedes that at the time of the manufacture of the product alleged to be defective the subsequent alternative design was feasible. Unless that concession is made by the manufacturer, the evidence normally will be admissible, but even then it is admissible only for the limited purpose of showing feasibility at the time of manufacture, and then only if a limiting instruction to that effect is given by the

court. *See, e.g., Bolm v. Triumph Corp.*, 71 A.D.2d 429, 437, 422 N.Y.S.2d 969, 975 (1979).

 At trial Ford informed the court that it did not contest that subsequent design changes were feasible at the time the respondent's truck was manufactured. Since Ford, on the record, had made that concession, it follows the admission in evidence of subsequent remedial measures by the trial court was error.

But even though the exclusion of Rule 407 was applicable, and even though the evidence was erroneously admitted, it does not follow that the case should be automatically remanded for retrial. Although error may exist, unless the error is prejudicial, no grounds exist for reversal. *See Midway Center Associates v. Midway Center, Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975). In neither its brief nor in its oral argument has Ford been able to demonstrate how it has sustained prejudice by the admission of the evidence.

Moreover, from our examination of the record, we have been unable to discern any prejudice. The record reveals that prior to 1977 Ford had received many complaints concerning the tendency of the automatic transmission shifting mechanism to slip from "park" into "reverse." It also reveals that as early as 1971 Ford was aware of the "illusory park" problem and that the problem was "occurring frequently in the field with high accident incidence." Long before the manufacture of the plaintiff's truck, an internal company memorandum suggested that alternative designs be explored. From this and other evidence in the record, the jury could have drawn the inferences that prior to 1977 Ford knew of and admitted the defect in the design of the transmission, and that notwithstanding that failure to take reasonable steps to correct the problem could result in a risk unreasonably dangerous to operators, it negligently did not do so. In our view, the admission in evidence of the two subse-

Cir.1977), when a state's strict liability law is essentially the same as its negligence law, Rule 407 has been applied to exclude evidence of

subsequent remedial measures. *See DeLuryea v. Winthrop Laboratories,* 697 F.2d 222, 229 (8th Cir.1983).

quent remedial measures was simply cumulative and therefore nonprejudicial.

3. Finally, Ford argues that respondent failed to present sufficient evidence to establish that Ford had breached a duty to warn the operator of the truck of the danger likely to result from the "illusory park" problem unless the operator made special efforts to ensure that the shifting lever was completely in the "park" position before leaving the vehicle with the engine running. Ford also contends that the trial court gave erroneous jury instructions on the issue—particularly relative to causation.

▇ As indicated, long before the manufacture of Kallio's truck, Ford had knowledge of the "illusory park" problem with automatic transmissions in vehicles it manufactured. It also knew that there was a "high accident incidence." Clearly, therefore, Ford had a legal duty to warn purchasers of its vehicles of the danger. *See, e.g., Germann v. F.L. Smithe Machine Co.*, 395 N.W.2d 922, 924–25 (Minn. 1986). Even though a product may not be defectively designed so as to be dangerous to one who properly uses it, a duty to warn may exist if a manufacturer has reason to believe a user or operator of it might so use it as to increase the risk of injury, particularly if the manufacturer has no reason to believe that the users will comprehend the risk. *See Id.; Bilotta v. Kelley Co.*, 346 N.W.2d 616, 621 (Minn.1984); *Holm v. Sponco Manufacturing, Inc.*, 324 N.W.2d 207, 212 (Minn.1982); *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 786 (Minn.1977).

Ford claims that the owner's manual that went with Kallio's truck warned the operator that when parking the vehicle, the automatic transmission lever should be in the "park" position, the hand brake set, and the engine turned off. However, as Kallio points out, those directions in the manual constituted no warning at all. The directions simply instructed the driver on proper parking of the vehicle—adding that to so park would save fuel! The manual failed to warn operators of dangers to others resulting from failure to place the transmission lever fully into the "park" position. No other warning of any kind was provided by Ford. In essence, there was almost a complete absence of any warning. It is clear that more than sufficient evidence exists to support the jury's implicit conclusion that Ford's duty to warn was breached.

Admittedly, however, the issue of causation is troublesome. No evidence was presented as to how Kallio might have acted on this occasion had Ford provided an adequate warning. Ford, contending that *Conti v. Ford Motor Co.*, 743 F.2d 195 (3rd Cir.1984) is on "all fours," argues that even had an adequate warning been provided by it, the accident would have happened anyway. Emphasizing that the record clearly shows that Kallio was aware that the truck might move if the shift lever was not completely in the "park" position, it asserts that any breach by it of any duty to warn could not be the legal cause of the accident and the resultant injuries. While that contention is not completely meritless, and while it properly could be vigorously addressed in final summation to the jury, as it was here, it does not compel us, an appellate court, to accept the conclusion that as a matter of law insufficient evidence existed to support the jury's causation finding.

▇ In our view a fundamental difference exists between the instant case and *Conti.* There, Conti, operating a vehicle containing a manual transmission, failed to depress the clutch pedal to disengage the transmission before attempting to start the engine. Clearly, Conti knew from 25 years experience in driving vehicles with manual transmissions that the transmission must be disengaged by depressing the clutch pedal to start the vehicle. Conti failed completely to perform the operation required before safely starting the car. In contrast, here respondent did what he was supposed to do. He shifted into what he believed was the "park" position. He was unaware that his movement might result in an "illusory park" creating a dangerous situation. Without deciding whether a rebuttable presumption exists that a warning would have been heeded (*see, e.g., Craven*

*v. Niagara Machine & Tool Works, Inc.,* 417 N.E.2d 1165, 1171 (Ind.Ct.App.1981)), we deem it sufficient to observe that in the instant case facts existed justifying submission to a jury of the issues of breach of duty to warn and causation. Likewise, the trial court's general instruction on causation was sufficient. Although Ford's request for submission of a more specific causation instruction was not granted, Ford had full opportunity to argue its instructions to the jury and did so.

■ Although it is normally preferable that in product liability tort cases separate interrogatories be used in the verdict form when the plaintiff's case alleges separate or alternative bases of recovery, in this case, notwithstanding that the preferred practice was not followed, we find it unnecessary to reverse for a new trial. The evidence in the instant case was sufficient to sustain the jury's verdict on either the theory of defective design or breach of a duty to warn. Accordingly, we affirm the court of appeals.

SIMONETT, J., specially concurs.

SIMONETT, Justice (concurring specially).

On the dashboard of plaintiff's 1977 automatic transmission Ford pickup is a panel indicator which tells the driver what gear he or she has shifted into. To put the pickup in park, the driver must move the shift lever far enough over to the left so that the indicator is on P. If the indicator is left between P[ark] and R[everse], the shift lever will rest on a "land," a flat surface between the P slot and the R slot on the rooster comb plate. If this happens, any vibration (such as jumping on the rear bumper of the pickup as plaintiff did here) may cause the shift lever to slide into reverse. The problem is that if the shift lever is not moved far enough to the left, but only to the "land" between P and R, the driver has the "feeling" that the pickup is in the park position when it actually is not. The parties refer to this phenomena as an illusory park. Unless the driver checks to see that the panel indicator is in the proper position or at least engages the

parking handbrake, there is the danger of the vehicle slipping into reverse and, if the engine is running (as it was here), of the pickup moving backwards.

Ford's transmission control system was common to the industry and accepted industry practice. Clearly, this system permitted a dangerous situation to develop under certain circumstances. In an effort to show this condition was not only dangerous but unreasonably dangerous under *Bilotta,* plaintiff put in evidence that Ford could have sharpened the tooth between park and reverse and deepened the park latch. Plaintiff's expert, Michael Inden, testified that this technology was feasible in the 1970's when Ford's 1977 pickup was manufactured, and that this design change would substantially reduce the occurrence of a phantom park. Ford conceded this design change was feasible for its 1977 models. Ford made this concession in an unsuccessful attempt to keep out the fact that in 1980 it had made this very design change. While conceding the feasibility of this design change, Ford's experts contended that there was no reliable evidence that the 1980 modifications had cured the problem. (Ironically, plaintiff's other expert, William Barr, did not think the 1980 design changes would help correct the problem either.) On this state of the record, such as it was, plaintiff had a prima facie case of strict liability for the jury.

My only reason for writing is to comment on further evidence offered by plaintiff on alternative design. In 1979, in a different trial, plaintiff's expert, William Barr, had testified that Ford's system was not unreasonably dangerous. In this case, however, Barr testified that he had now invented a device, as yet untested, never yet installed in any vehicle, containing some "bugs," but which he thought with "a good deal of work" might fix the problem. The majority opinion says this testimony of alternative design was "weak." In my view, Barr did not show his device was practical, and his testimony would not have withstood a motion to strike if one had been made. (Ford's expert, it might be added, thought Barr's device could not be

made to work satisfactorily; that even if it could, it would not significantly reduce the problem; and that the device might make shifting more difficult.)

Conscious design defects present difficult problems of proof for both plaintiffs and manufacturers. There is much room for second guessing, and courts are being asked to establish standards of reasonableness for manufacturers (whether it be Ford or a fledgling family operation). Establishing standards entails a weighing of engineering, marketing, and financing factors, which, at times, may be a difficult task for courts to perform. *See* Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication,* 73 Colum.L.Rev. 1531 (1973). On the other hand, the establishment of standards cannot always be avoided by passing the problem off to the jury under a general reasonable care instruction.

In any event, the limited issue before us is whether the trial court erred in refusing to give defendant's requested instruction that plaintiff was required to prove the existence of a feasible, practical alternative design. I agree with the majority opinion that the trial court's instructions on burden of proof were adequate and that it was unnecessary to give the requested instruction which would have unduly singled out one aspect of the proof. I also agree with the court's disposition of the other issues.

Sometimes where proof is lacking for a conscious design defect, plaintiff may still be able to show breach of a duty to warn. Henderson, *supra,* at 1562–63. Here, plaintiff knew his pickup might move if the shift lever was not completely in the park position, and there was no need to warn on this elementary, obvious fact. But what plaintiff did not know was that the shift lever would feel like it was in park when it was not. The jury could have found there should have been a warning placed in the owner's manual about this illusory effect.