**OMNETICS, INC., Appellant,**

v.

**RADIANT TECHNOLOGY CORPORATION,**
**Respondent.**

**No. CX–88–2355.**

Court of Appeals of Minnesota.

May 23, 1989.

Thomas E. Marshall, Mahoney, Dougherty and Mahoney, Minneapolis, for appellant.

Larry D. Espel, Therese M. Hankel, Popham, Haik Schnobrich & Kaufman, Ltd., Minneapolis, for respondent.

Heard, considered and decided by LANSING, P.J., and SCHUMACHER and MULALLY, JJ.

## OPINION

EDWARD D. MULALLY, Acting Judge.

Omnetics, Inc. appeals the trial court's order denying its motion for a new trial or judgment notwithstanding the verdict (JNOV). Appellant sustained property damage when a laboratory immersion heater, manufactured by respondent Radiant Technology Corporation, overheated and started a fire on appellant's premises. By special verdict, the jury determined that the heater was not defectively designed, but that respondent's failure to provide adequate warnings or instructions for safe use rendered it in a defective condition unreasonably dangerous to the consumer. The jury further found, however, that such defective condition was not a direct cause of the fire and that the fire was directly caused by appellant's failure to exercise reasonable care for its own safety. Consequently, the trial court entered judgment for respondent. Appellant's motion for a new trial or JNOV was denied and this appeal followed. We affirm in part and dismiss in part.

## FACTS

Appellant, which was in the business of metal plating, operated a research laboratory in its facility. Many experiments conducted in the research lab required the use of immersion heaters to heat solutions in large polypropylene plastic tanks.

The immersion heater which caused the fire was a Model AB–51–A1, manufactured by respondent sometime in 1982 or shortly before. It was eight inches in length, had a power of 500 watts, and could reach 1400°F if exposed to the open air. It was activated by directly plugging it into an electrical outlet; it had no on-off switch or any indicator light to show whether it was on or off.

Respondent began the manufacture of this model in 1972, and the design has not changed over the years. Respondent's brochure recommends the use of optional safety devices, such as a fuse or automatic shut-off, with this type of immersion heater. As explained in the brochure, the danger is that if the solution in the tank drops, the heater will become exposed to open air and overheat.

On the Thursday or Friday before the fire, Bradley Hoium, a relatively new employee, was directed to shut down the lab for the weekend. On re-cross examination, Hoium was asked:

Q. Now, when you went into the lab on the close of the business day, it was your intention not just to shut off everything but to actually unplug everything just to be on the safe side, was it not?

A. Yes, either to unplug or completely turn down the thermostat so the heaters had no chance of being left on.

On Sunday, April 18, 1982, a fire was discovered in the research lab area. The parties agree the fire occurred when a Radiant Technology Model AB–51–8L immersion heater overheated and ignited the polypropylene tank into which it was placed. They also agree that property damage was $138,173.98.

Appellant commenced this action seeking damages on theories of defective product design, failure to warn, and breaches of expressed and implied warranties. Following are the pertinent interrogatories submitted to the jury at the close of the evidence; the jury answered as indicated.

1. Was the tank heater in a defective condition unreasonably dangerous because of its design?

Yes _____    No _X_

2. If your answer to question #1 was "yes," then answer this question: Was such condition a direct cause of the plaintiff's property damage?

Yes_____    No_____

3. Was the tank heater in a defective condition unreasonably dangerous because the manufacturer failed to provide adequate warnings or instructions for safe use of the tank heater?

Yes_X_    No_____

4. If your answer to question #4 was "yes," then answer this question: Was such condition a direct cause of the plaintiff's property damage?

Yes___ No _X_

5. Did the plaintiff fail to exercise reasonable care for its own safety?

Yes _X_ No___

6. If your answer to question #5 was "yes," then answer this question: Was the plaintiff's failure to exercise reasonable care a direct cause of its damages?

Yes _X_ No___

The trial court subsequently issued its findings, conclusions and order for judgment dismissing appellant's claims. Appellant then moved for a new trial or JNOV. The motion for a new trial was based on, among other things, claims that the trial court failed to properly instruct the jury and that the jury should not have been allowed to consider appellant's contributory fault in a strict liability action. The motion for JNOV was based on the claim that the evidence was insufficient to establish appellant's acts or omissions directly caused the fire. Omnetics appeals from the trial court's denial of its motions.

## ISSUES

1. Did the trial court abuse its discretion in instructing the jury only according to CIV JIG 117 regarding design defects, and refusing to give a supplementary instruction setting forth a four-part test for determining the feasibility of an alternative design?

2. Did the trial court err in submitting the question of comparative fault to the jury where one of the theories of recovery was strict liability?

3. Is the order denying appellant's motion for JNOV reviewable and, if so, did the trial court err in determining the evidence was sufficient to support findings that appellant failed to exercise reasonable care in using the product and that such failure was a direct cause of the injury?

## ANALYSIS

■ 1. On the issue of whether the immersion heater was defectively designed, the trial court recited CIV JIG 117. *See* 4 *Minnesota Practice*, CIV JIG III, 117 (1986 and Supp.1988). The trial court also gave the full instruction for a manufacturer's duty to warn. *See id.* at CIV JIG 119.

Appellant did not object to the JIG 119 failure to warn instruction. It did, however, object to the JIG 117 defective design warning. Appellant argued that because the feasibility of an alternative design for the immersion heater was a critical issue in the case, the following additional instruction should have been given:

In deciding if the suggested alternative design was feasible at the time the product in question was manufactured, there are several factors you must consider. First, was the suggested alternative design technologically feasible? This means that, given the technology available at the time the product was manufactured, the suggested alternative was technically available.

Second, you must consider the safety of the suggested alternative. Does it provide overall safety as good as or better than that of the product in question, and does it provide better protection against the particular hazard or risk of injury created by the product in question.

Third, you must consider the cost of the suggested alternative. Will the suggested alternative significantly increase the cost of the product in question.

Fourth, you must consider whether the suggested alternative will affect the performance of the product.

Before you find the suggested alternative to be feasible, you must find that any increases in the cost of the product or changes in the performance and function of the product are outweighed by the added safety of the alternative design.

This instruction is set forth in the committee's comments to CIV JIG 117. *Id.* at CIV JIG 117. As to the applicability of this additional instruction, the committee states:

Although a more general weighing and balancing of the risk created by and utility of the product may be considered, it may be that the critical issue in the case will be the feasibility of a product design. If a jury instruction focusing specifically on the feasibility of an alternative design is deemed appropriate, the following jury instruction on the issue is suggested[.] *Id.*

A trial court has discretion in determining what jury instructions to give. *Floen v. Sund*, 255 Minn. 211, 215–16, 96 N.W.2d 563, 566–67 (1959). A new trial is not warranted for failure to give a requested instruction if the general charge fairly and accurately states the applicable law. *See Manion v. Tweedy*, 257 Minn. 59, 64, 100 N.W.2d 124, 128 (1959) (quoting *Cameron v. Evans*, 241 Minn. 200, 202, 62 N.W.2d 793, 798 (1954)).

The supreme court has stated that CIV JIG 117 fairly and accurately states the law in Minnesota as to defective design. *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96 (Minn.1987). The issue, therefore, is whether the question of alternative feasible design was so important that the trial court abused its discretion in not giving the requested supplementary instruction.

In *Kallio*, the defendant requested the trial court to instruct the jury that the plaintiff had the burden of establishing the existence of a safer, practical alternative design as an essential element of proving defective product design. The supreme court affirmed the trial court's refusal to give such an instruction, in part, because the court believed the requested instruction focusing on the feasible alternative decision tended to overemphasize that factor. 407 N.W.2d at 97. The court stated that emphasizing the issue of a safer, feasible alternative is "properly the function of counsel in closing argument, not * * * the court in its instructions." *Id.* (quoting *Alholm v. Wilt*, 394 N.W.2d 488, 491 (Minn. 1986)).

Although the supreme court in *Kallio* dealt with a different supplementary instruction, we believe that court was expressing its general disapproval of giving supplementary jury instructions when the primary instruction correctly states the law and counsel have full opportunity in their closing arguments to address what they feel are the important factors of the law. CIV JIG 117 states that in considering whether a manufacturer used reasonable care, the jury should keep in mind that "the manufacturer is obligated to keep informed of scientific knowledge and discoveries in its field." 4 *Minnesota Practice*, CIV JIG III, 117 (1986 and Supp.1988). In closing, appellant's counsel emphasized this factor by arguing at length that respondent was negligent by not more safely designing the immersion heater even though a safer design was allegedly feasible. Consequently, because CIV JIG 117 accurately states the law and because appellant's counsel was free to argue the importance of a feasible alternative design, we hold that the trial court did not abuse its discretion in refusing to give the requested supplementary instruction.

■ 2. The settled rule in Minnesota is that the ordinary contributory negligence of a plaintiff can be compared with the strict liability of defendant under the state's comparative fault law. *Busch v. Busch Construction, Inc.*, 262 N.W.2d 377, 393–94 (Minn.1977) (construing Minn.Stat. § 604.01 (1976)).[1] As a limitation to this general rule, the supreme court stated that "a consumer's negligent failure to inspect a product or to guard against defects is not a defense and thus may not be compared with [defendant's] strict liability." *Id.* at 394. The court further stated, however, that "all other types of consumer negligence, misuse, or assumption of the risk must be compared with the [defendant's] strict liability under the statute." *Id.* (footnote omitted).

1. Since 1976, section 604.01 was amended to substitute the term "fault" for "negligence" and to state that "fault" includes, *inter alia* "unreasonable assumption of the risk * * *, misuse of a product and unreasonable failure to avoid an injury or to mitigate damages." 1978 Minn. Laws ch. 738, §§ 6, 7, now *codified at* Minn. Stat. § 604.01, subds. 1, 1a (1988).

Appellant claims the general rule articulated in *Busch* has been changed by subsequent supreme court decisions in *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207 (Minn. 1982) and *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616 (Minn.1984), *opinion after remand*, 358 N.W.2d 679 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. March 13, 1985). In particular, appellant argues *Holm* and *Bilotta* stand for the proposition that once a manufacturer is deemed to have produced an unreasonably dangerous product, either through a defective design or failure to warn, the manufacturer's liability is absolutely established and the consumer's actions can no longer be considered in reducing or precluding the manufacturer's liability. We disagree.

*Holm* held that a manufacturer is not absolved of its responsibility to design a safe product, or to warn of its dangers, even though the dangerousness of the product is open and obvious to the consumer. 324 N.W.2d at 207. In expanding on *Holm*, the supreme court in *Bilotta* held that the manufacturer of an unsafe product is not automatically absolved of liability simply because it makes available an optional safety device. 346 N.W.2d at 624. In holding that the offer of optional safety devices is not an absolute defense to liability, the supreme court stated: "[A] manufacturer may not delegate its duty to design a reasonably safe product." *Id.*

■ *Holm* and *Bilotta* are elaborations on the *Busch* principles that a manufacturer has a duty to provide a safe product and that the consumer is not required to inspect that product to see whether or not it is safe. It seems clear, however, that even though the consumer does not have a duty to inspect for or guard against defects, the consumer still must employ ordinary care in its use of the product. Neither *Holm* nor *Bilotta* absolves the consumer of this duty. Consequently, given the supreme court's holding in *Busch* that strict liability claims are subject to the comparative fault statute, at least as to consumer negligence, misuse or assumption of the risk, and given there have been no later developments to overturn this ruling, the trial court properly submitted the issue of comparative fault to the jury in this case.

■ That strict liability claims remain subject to comparative fault principles is also apparent from the supreme court's discussions of the dubious distinction between negligence and strict liability. The supreme court noted that the now obsolete phrase "comparative *negligence*" is a misnomer because

> [t]he comparative negligence statute becomes more than a comparative *negligence* or even a comparative *fault* statute; it becomes a comparative *cause* statute under which all independent and concurrent causes of an accident may be apportioned on a percentage basis.

*Busch*, 262 N.W.2d at 394 (emphasis in original) (quoting Jensvold, *A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases*, 58 Minn.L.Rev. 723, 725 (1974)). Thus, the supreme court indicated that whether one analyzes responsibility based on negligence or fault, the ultimate determination centers on what combination of factors caused the result, and what the percentage allocation for each cause should be. The majority in *Bilotta* addressed the distinction between strict liability and negligence, stating:

> [I]n strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.

346 N.W.2d at 622. Here, the distinction between actual and imputed knowledge is irrelevant because respondent readily admits it knew the potential dangers created by the immersion heater. Therefore, because there is no distinction between strict liability and negligence in this case, and because a negligence claim is clearly subject to comparative fault principles, appellant's strict liability claim is similarly subject to comparative fault principles.

■ 3. Where no appeal is taken from the judgment itself, an order denying a motion for JNOV is generally not reviewable. *Mocuik v. Svoboda*, 253 Minn. 562, 566–67, 93 N.W.2d 547, 550 (1958). An order denying a motion for JNOV may be

reviewable if the motion for JNOV is blended with a motion for a new trial and the arguments raised in the JNOV motion are essentially the same as those raised in the new trial motion. *Gertken v. Farmers Elevator of Kensington, Minnesota, Inc.,* 411 N.W.2d 550, 553 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Oct. 28, 1987). Although appellant blended its motions for JNOV and a new trial, the grounds therefor were entirely distinct, not overlapping in any way. Therefore, that portion of the trial court's order denying appellant's motion for JNOV is not reviewable. *See id.*

Even if we were to review the order, we would affirm. When deciding whether the trial court properly denied a motion for JNOV, the question is whether there is *any* competent evidence reasonably tending to support the verdict. *Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 507, 232 N.W.2d 236, 239 (1975). Although Hoium's testimony is somewhat equivocal, the jury could reasonably infer Hoium knew there was a risk of fire if the immersion heater was left on over the weekend. Because a jury could have reasonably found Hoium knew or should have known of the risk of fire, the jury could then have found he should have known it was important to make sure the immersion heater was deactivated. Consequently, the jury could have found that appellant, through the acts or omissions of its employee, was negligent in failing to unplug the immersion heater, and that this negligence was the direct cause of the fire.

### DECISION

That portion of the trial court's order denying appellant's motion for a new trial is affirmed in all respects. That portion of the trial court's order denying appellant's motion for JNOV is not reviewable, and, therefore, the appeal from that portion of the order is dismissed.

Affirmed in part and dismissed in part.