Kelci STRINGER, Plaintiff,

v.

NATIONAL FOOTBALL LEAGUE, et al., Defendants.

Case No. 2:03–cv–665.

United States District Court, S.D. Ohio, Eastern Division.

July 10, 2009.

Opinion Denying Reconsideration Sept. 22, 2010.

Stanley Morris Chesley, Louise Malbin Roselle, Paul M. De Marco, Renee Ann Infante, Wilbert Benjamin Markovits, Waite Schneider Bayless & Chesley Co.,

LPA, Cincinnati, OH, Kenneth R. White, Mankato, MN, for Plaintiff.

Robert C. Tucker, Scott J. Kelly, Irene C. Keyse–Walker, Tucker Ellis & West LLP, Cleveland, OH, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOHN D. HOLSCHUH, District Judge.

Korey Stringer ("Stringer"), a football player for the Minnesota Vikings ("Vikings"), suffered a heat stroke and died during the Vikings' July 2001 training camp. Plaintiff Kelci Stringer ("Plaintiff"), Stringer's wife and the executor of his estate, brings this wrongful death/survivorship action against, among others, the All American Sports Corporation and Riddell, Inc. (collectively, "Defendants"), and alleges that Defendants' helmets and shoulder pads are defective and caused Stringer's death. This matter is currently before the court on Defendants' Motion for Summary Judgment. (Doc. # 53.) For the following reasons, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART.**

### I. Background

Stringer, an offensive lineman for the Vikings, reported to the Vikings training camp in Mankato, Minnesota on July 29, 2001. Conditions at the training camp were extremely hot and humid, and were potentially dangerous to anyone who was not acclimated to exercising in the heat. (Dep. of Walter Lyons p. 29, doc. # 56.) Stringer had a history of showing up to training camp in poor physical condition, and even though he arrived to the 2001 training camp in better condition than he had in previous years he still weighed approximately 340 lbs and was not acclimated to exercising in the heat. (Dep. of Mike Tice pp. 47, 85–6, doc. # 54.)

Training camp practice began on July 30. During both the morning and after-noon practices on July 30 the players, including Stringer, wore "shells," which consisted of a helmet, shoulder pads, shorts and a jersey, in addition to shoes, socks, and undergarments. The helmet and shoulder pads that Stringer wore were manufactured by Defendants, and were constructed out of thick, dense padding to protect against the impacts players experienced during football practices and games. Although both the helmet and shoulder pads contained warnings against misuse, neither contained any warning about a risk of suffering a heat stroke or other heat-related illness. Stringer participated in the morning practice without incident, although he complained to coaches and trainers of an upset stomach. (*Id.* p. 110.)

During the afternoon practice, however, Stringer suffered an episode of heat exhaustion. Stringer continued to complain about his stomach, and fellow players and coaches observed Stringer vomiting during drills. (Dep. of Matthew Birk p. 48, doc. # 57; Tice Dep. pp. 122–25.) Stringer's performance was described as "sluggish" and "struggling;" "[h]e was slow getting back to the line when he finished his repetitions and individual drills. He was not talkative, which he normally was; he was quiet. [He] had a look of anguish on his face." (Tice Dep. p. 124.) When Stringer continued to vomit, coaches called for a trainer and removed Stringer from practice over Stringer's objections. The trainers took Stringer to an air conditioned trailer to cool down and gave him water, but did not give him any other first aid. (Dep. of Charles Barta p. 46, 47, doc. # 55.)

Training camp continued on July 31 with a morning practice. During this practice the players wore full pads instead of shells, i.e. football pants with knee, thigh, and hip pads instead of shorts, along with a helmet, shoulder pads, jersey, shoes, socks,

and undergarments. Just as on July 30, the helmet and shoulder pads Stringer wore were manufactured by Defendants. Stringer continued to complain of stomach problems before the practice but trainers, after simply weighing him and determining that he had gained back the fluid weight he lost the previous day, cleared him to return to practice with the direction to continue drinking fluids. (Barta Dep. p. 259–60.) Stringer practiced well and his coaches did not observe him struggling with the heat (Tice Dep. 183–84), but at approximately 11:00 a.m. during a set of extra drills after the formal practice had ended Stringer collapsed on the practice field. (Dep. of Billy McFarland p. 46, doc. # 90–2.) He told his teammates that he needed a trainer (Birk Dep. 79), and once the trainers arrived Stringer got up and walked with them to the air conditioned trailer. (Dep. of Paul Osterman p. 40, doc. # 66.)

Inside the trailer the trainers allowed Stringer to rest and cool off and gave him water, but did not give him any other aid, assess his condition, or otherwise suspect that Stringer was in danger of or was suffering a heat related illness. (*Id.* p. 65.) Stringer did not speak to or interact with the trainers except to thank them for removing his shoes, socks, and athletic tape (*id.* p. 48–57), but he moved back and forth from a training table to the floor several times and was detached and distant. These are symptoms of heat stroke, but were not recognized by the trainers. After approximately 30 minutes in the trailer Stringer laid down on the floor and became unresponsive, and the trainers began to suspect that something was wrong. (*Id.* p. 70–72.) Stringer was still sweating after 30 minutes inside an air conditioned trailer, and his skin felt cool and moist (*id.* p. 79), both of which are symptoms of heat stroke. The trainers called for a medical advisor who arrived and initially believed that Stringer was hyperventilating, and

consequently told one of the trainers to hold a plastic bag over Stringer's mouth. When Stringer did not respond to this treatment the trainers, although still not knowing what was wrong with Stringer, called for an ambulance at approximately 12:00 p.m. to take Stringer to the emergency room. (Dep. of Fred Zamberletti p. 67–69, doc. # 63.) At no point did anyone attempt to cool Stringer or realize that he was suffering from heat stroke.

Stringer arrived at the hospital at approximately 12:30 p.m. By this time he was comatose and his pulse was rapid. His temperature was taken for the first time since he collapsed, and it registered as 108.8° F. a full hour and a half after Stringer had stopped exercising. Stringer was admitted to the hospital and received treatment, but died at approximately 1:30 a.m. on August 1, 2001 due to multi-organ failure and complications from exertional heat stroke.

Plaintiff sued the National Football League, NFL Properties, Inc., Dr. John Lombardo (the "NFL Defendants"), and Defendants on July 28, 2003. (Compl., doc. # 1.) Plaintiff brought negligence claims against the NFL Defendants and alleged that they breached a duty of care to Stringer by failing to provide complete, current and competent information and directions to NFL athletic trainers, physicians and coaches regarding heat-related illness and its prevention, symptoms and treatment. (*Id.* ¶¶ 29–43.) Plaintiff brought products liability claims against Defendants based on both design defect and failure to warn theories, as well as breach of warranty claims. Plaintiff alleged that Defendants' helmets and shoulder pads were defectively designed and/or manufactured because they act as an insulating blanket preventing evaporation and heat dissipation. According to Plaintiff, this unreasonably increases a player's

body temperature and was a substantial contributing factor to Stringer suffering a heat stroke. Additionally, Plaintiff alleges that Defendants breached a duty to warn of this danger by not including any heat-related illness warning on either the helmet or shoulder pads, and that Defendants breached implied and express warranties. (*Id.* ¶¶ 44–64.)

Both the NFL Defendants and Defendants initially argued that Plaintiff's claims were preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and filed motions to dismiss on that ground. (Doc. ## 7, 20.) The court, in a Memorandum Opinion and Order dated February 1, 2007, denied Defendants' motion in full and granted in part and denied in part the NFL Defendants' motion, *see Stringer v. National Football League et al.*, 474 F.Supp.2d 894 (S.D.Ohio 2007), and the case proceeded to discovery. After a sufficient period of discovery, Defendants filed a Motion for Summary Judgment on October 30, 2008. (Doc. # 53.) Plaintiff responded on December 24, 2008 (doc. # 80), and Defendants replied on January 19, 2009 (doc. # 84). Defendants' Motion is now ripe for adjudication. Plaintiff and the NFL Defendants, however, stipulated to the dismissal with prejudice of Plaintiff's claims against the NFL Defendants on January 21, 2009. (Doc. # 89.) The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## II. Summary Judgment Standard

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (*quoting* FED. R. CIV. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

[Summary judgment] ... should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right to trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). *See also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir.1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the

motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 460 (6th Cir.2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). *See also Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. *See also Leary*, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477

U.S. at 322, 106 S.Ct. 2548. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir.1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *Lansing Dairy, Inc.*, 39 F.3d at 1347.

### III. Analysis

■ Plaintiff brings products liability claims, based on failure to warn and design defect theories, and implied and express warranty claims against Defendants.[1]

---

1. Under Minnesota law, a cause of action for failure to warn is separate from a cause of action for defective product design. *See Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 626 (Minn.1984) (Simonett, J., concurring).

These claims, although applying some negligence principles, are strict liability claims. *McCormack v. Hankscraft Co.*, 278 Minn. 322, 154 N.W.2d 488, 501 (1967).

Minnesota law governs the substance of these claims. Because this court's jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C. § 1332, the court must apply Ohio's choice of law rules, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and Ohio has adopted the Restatement (Second) of Conflict of Laws to govern the question of what law to apply in tort actions, *see Morgan v. Biro Manufacturing*, 15 Ohio St.3d 339, 342, 474 N.E.2d 286 (1984). Section 175 of the Restatement governs actions for wrongful death, and states that "the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship ... to the occurrence and the parties, in which event the local law of the other state will be applied." In this case, Minnesota is the state where the injury occurred and there is no evidence that any other state has a significant relationship to the occurrence or the parties.

### A. Failure to Warn Claim

■ To establish a products liability failure to warn claim under Minnesota law, a plaintiff must show 1) that the manufacturer had a duty to warn of the dangerous nature of the product; 2) a breach of that duty; and 3) that the lack of a warning caused the relevant injury. *See Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 924 (8th Cir.2004) (applying Minnesota law). The parties dispute the first and third elements.[2]

### 1. Duty to Warn

■ The question of whether a duty to warn exists is a question of law for the

court to decide. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986). This question hinges on whether the injury was reasonably foreseeable to the manufacturer. *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987).

> In determining whether the duty exists, the court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts the hold there is no duty, and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists.

*Germann*, 395 N.W.2d at 924. There is, however, no duty to warn of dangers if they are obvious. *Westerberg v. Sch. Dist. No. 792, Todd Cty.*, 276 Minn. 1, 10, 148 N.W.2d 312 (1967).

■ Defendants argue that they had no duty to warn because the danger presented by the helmet and shoulder pads was obvious. Defendants point out that a fundamental characteristic of football helmets and shoulder pads is that they are made of thick, durable materials that protect the body from impact, and that it is common knowledge that wearing heavy materials will trap heat. Thus, according to Defendants, it is obvious that wearing a helmet and shoulder pads will make a wearer hotter, negating any duty on their part to warn of risks associated with wearing the helmet and shoulder pads and practicing in hot conditions. (Def. Mot. Summ. J. pp. 17–19, doc. # 53.) Plaintiff counters by arguing that the "event causing the damage," *see Germann*, 395 N.W.2d at 924, i.e.

---

**2.** There is no dispute as to the second element because, assuming that Defendants had a duty to warn, they unquestionably breached that duty by providing no heat-related illness warning at all. On the other hand, if Defendants did not have a duty to warn, there could be no breach of duty.

Stringer's heat stroke, must have been obvious, not the general risk of becoming hotter when wearing a helmet and shoulder pads. Plaintiff argues that there no indication that Stringer, his coaches, or his trainers were aware of this risk, that it was not obvious, and that Defendants had a duty to warn of this risk. (Pl. Resp. pp. 35–38, doc. # 80.)

The court agrees with Plaintiff that, under Minnesota law, the specific risk of developing heat stroke, not a more general risk of becoming hotter while wearing a helmet and shoulder pads, must have been apparent in order to make the danger obvious. In *Indep. Sch. Dist. No. 14 v. AMPRO Corp.,* 361 N.W.2d 138 (Minn.Ct. App.1985), two students wanting to "make a little smoke" set fire to an athletic mat stored in a high school's gymnasium. The mat, once on fire, burned extremely rapidly, gave off intense heat, and emitted a considerable amount of dense, black smoke that caused extensive damage to the school building. The school district, in addition to suing the students, brought a products liability claim against the mat's manufacturers and alleged that the mat was unreasonably dangerous and that the manufacturers had failed to warn of the mat's propensity for unusually rapid burning and excessive smoke production. *Id.* at 141.

The manufacturers argued that they had no duty to warn because it was obvious that an athletic mat can burn when exposed to flame. After the trial court granted the manufacturers' motion for a directed verdict on this issue, the Minnesota Court of Appeals reversed and held that the danger was not obvious:

> [Manufacturers], however, fail to distinguish ordinary burning from the hot, rapid, smoky burning of which [the school district] presented evidence. This is a different, more serious, and more unexpected danger than that posed by ordinary flammable items.

> Such a danger is not obvious, and while [the school district] admitted knowing that [the mats] might burn, it indicated no knowledge of the speed or intensity with which they burned.

*Id.* at 143. The court of appeals remanded the case for submission to a jury.

The Eighth Circuit Court of Appeals applied *Indep. Sch. Dist. No. 14* in *Gamradt v. Federal Laboratories, Inc.,* 380 F.3d 416 (8th Cir.2004) (applying Minnesota law). In that case, a prison guard was injured during a training exercise by a smoke grenade when the grenade was accidentally detonated in a confined stairwell. After inhaling the smoke in the enclosed area, the plaintiff suffered from long-term shortness of breath and coughing, and permanently lost 60% of his aerobic lung capacity. He filed suit against the grenade's manufacturers and alleged that they "failed to warn of the dangers associated with activating a black smoke grenade in an enclosed area." *Id.* at 418. Although the manufacturers did not raise the issue, the district court sua sponte found that the dangers associated with the smoke grenade were obvious, and granted the manufacturers' motion for summary judgment.

The Eighth Circuit reversed. Relying on the reasoning in *Indep. Sch. Dist. No. 14,* the court found that

> [k]nowledge of the general danger associated with minor smoke inhalation is not enough to relieve the manufacturer of its duty to warn about foreseeable dangers associated with indoor use of a black smoke grenade.... The specific risk of permanent respiratory damage posed by using the black smoke grenade indoors must have been obvious to the user.... In this case, while it may be obvious that a black smoke grenade may emit an opaque gas, and it may be obvious that the substance could cause mi-

nor discomforts, we do not think it is obvious that a person could permanently lose 60% of his aerobic capacity as a result of being exposed to a black smoke grenade that was detonated indoors.... Quite obviously, the dangers posed by activating a black smoke grenade indoors are "different, more serious, and more unexpected" than the general dangers of detonating a black smoke grenade outdoors.

*Id.* at 420–21 (internal citations and paragraph breaks omitted). The Eighth Circuit remanded the case to the district court for trial.

■ The court reaches the same result in this case. While it is indeed common knowledge that wearing thick, dense items such as a football helmet and shoulder pads will make the wearer hotter, this general knowledge is different from the more specific knowledge that wearing such items during extremely hot and humid conditions and while engaged in strenuous exercise can cause the wearer to suffer heat exhaustion and heat stroke. Heat exhaustion and heat stroke pose a "different, more serious, and more unexpected" danger than any general danger that would have been obvious to Stringer. Although Defendants argue that Stringer was an experienced football player and sophisticated user of the helmet and shoulder pads to whom this danger should have been obvious (Def. Mot. Summ. J. pp. 19–20, doc. # 53), "[p]ast experience with a product ... does not necessarily alert users to all of the dangers associated with the product." *Willmar Poultry Co. v. Carus Chemical Co.,* 378 N.W.2d 830, 835 (Minn.Ct.App.1985). There is no evidence in the record that Stringer had any knowledge of the heightened risk of developing heat stroke, as opposed to the general risk of becoming hotter, associated with wearing Defendants' helmet and shoulder pads in the extremely hot and humid conditions of the Vikings' training camp. Additional-

ly, the question of whether a user's knowledge of the risks posed by a product will excuse the manufacturer's duty to warn is generally a question of fact that is not properly resolved on summary judgment. *Id.* The court concludes that the risk was not obvious.

■ Furthermore, under the *Germann* test quoted above, Defendants had a duty to warn of this risk. The connection between Stringer's heat stroke and Defendants' failure to warn is not so remote as to relieve Defendants of liability as a matter of law, and a player suffering a heat stroke while wearing Defendants' helmet and shoulder pads should have been reasonably foreseeable to Defendants. Medical research nearly 50 years old has recognized a potential link between wearing football equipment and heat-related illnesses (Exs. 2, 3 to Dep. of Lawrence Armstrong, doc. # 82), and Defendants have received letters from product designers warning of the risks of users developing heat strokes as a result of wearing Defendants' helmets and shoulder pads (Mark Monica Letter, Ex. 6 to Dep. of Lawrence Armstrong, doc. # 82). Plaintiff has also offered expert testimony opining that Defendants' helmet and shoulder pads were substantial contributing factors in Stringer suffering a heat stroke. (Pl. Resp. pp. 22–25, doc. # 80). Although Defendants argue that this testimony does not establish a connection between their products and Stringer's heat stroke and thus "the connection between the lack of a warning ... and Stringer's heat stroke is too remote to impose liability as a matter of law" (Def. Mot. Summ. J. p. 32 n. 7, doc. # 53), the court finds that Plaintiff's expert testimony is sufficient to create a genuine dispute as to this issue. The connection between Defendants' products and Stringer's heat stroke is not too remote to relieve Defendants of liability as a matter of law.

Defendants have in fact recognized that other risks of injury, such as the risks surrounding players using the helmet to "spear" or ram into other players and the general risks of impact injuries associated with playing football, are reasonably foreseeable, and have included warnings about those risks on the helmet and shoulder pads. The same should hold true for other reasonably foreseeable risks of injury. It was reasonably foreseeable to Defendants that a user of their helmets and shoulder pads during extremely hot and humid conditions might suffer from a heat stroke, and the court thus concludes that Defendants owed Stringer a duty to warn.

 Defendants offer another defense, and argue that they had no duty to warn the end users of their products, such as Stringer, because the Vikings trainers and coaches were sophisticated intermediaries. (Def. Mot. Summ. J. pp. 26–28, doc. # 53.)

> Under the sophisticated intermediary defense, some courts have held that a product supplier has no duty to warn the ultimate user where either of two situations is present: (1) the end user's employer already has a full range of knowledge of the dangers, equal to that of the supplier or (2) the supplier makes the employer knowledgeable by providing adequate warnings and safety instructions to the employer. . . . [T]he sophisticated intermediary defense is generally only available where the supplier can show that it used reasonable care in relying upon the intermediary to give the warning to the end user.

*Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 277–78 (Minn.2004). The sophisticated intermediary defense does not technically discharge the duty to warn; rather, it focuses on the conduct that the manufacturer/supplier undertook to discharge that duty, and asks whether that conduct was reasonable in light of the circumstances.

The applicability of the sophisticated intermediary defense is usually a question of fact best left to the jury. *See id.* at 279–80 (in action by foundry worker injured by silica dust against silica supplier, supplier's sophisticated intermediary defense and reasonable reliance on foundry to impart proper warnings presented genuine issues of material fact that precluded summary judgment for supplier).

In this case, genuine factual issues exist as to the reasonableness of Defendants' reliance on the Vikings organization to give appropriate warnings to its players. Defendants argue that the evidence is "overwhelming" that the Vikings trainers and coaches were aware of and knew how to address the risk of heat illnesses (Def. Mot. Summ. J. p. 37, doc. # 53) and there is some evidence tending to support this argument. However, there is also evidence, such as the Vikings trainers' response to and treatment of Stringer's heat stroke, that suggests that the Vikings trainers were not sophisticated intermediaries, that they did not have the specialized knowledge required to properly address the risks, and that Defendants' reliance on them to discharge the duty to warn was unreasonable. Questions of reasonableness and reasonable reliance are jury questions, and are not properly resolved by the court on summary judgment. *See, e.g., Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 303 (6th Cir.2008); *Gray*, 676 N.W.2d at 280. Whether the sophisticated intermediary defense applies in this case is best left to the jury to decide.

### 2. Causation

 To establish causation in a failure to warn claim, Plaintiff must show that had a warning been given, the injury would not have occurred. This requires Plaintiff to present "some admissible evidence [that Stringer or the Vikings] would have acted

differently had the manufacturers provided adequate warnings." [3] *Tuttle,* 377 F.3d at 924. Questions of causation are generally reserved for the jury. *Lubbers v. Anderson,* 539 N.W.2d 398, 402 (Minn. 1995). "It is only where the evidence is so clear and conclusive as to leave no room for differences of opinion among reasonable men that the issue of causation becomes one of law to be decided by the court." *Vanderweyst v. Langford,* 303 Minn. 575, 228 N.W.2d 271, 272 (1975).

Defendants offer two arguments as to why there is no genuine issue on causation. First, Defendants argue that there is no evidence tending to show that Stringer would have refused to practice or otherwise changed his own behavior in response to a warning. Second, Defendants argue that there is no evidence that a warning would have changed the actions of the Vikings' trainers and staff. (Def. Mot. Summ. J. pp. 33–34, doc. # 53.) Plaintiff responds by arguing that a jury could reasonably infer that Stringer would have followed a warning, and that the Vikings' trainers' response to Stringer's condition illustrates that a warning could have altered their behavior and prevented Stringer's heat stroke. (Pl. Resp. pp. 43–45, doc. # 80.)

### a. Whether a Warning Would Have Changed Stringer's Conduct

■ As to the first argument, the court agrees with Defendants. Defendants point out that there is no affirmative evidence showing that Stringer would have done anything differently during the July 31 practice if he had been warned of the possible dangers of suffering a heat stroke.

Stringer was required to wear the helmet and shoulder pads during practice, and although one of Plaintiff's experts testified that a warning might have prompted Stringer to remove his helmet between drills, Defendants point out that video of the July 31 practice, as well as the testimony of Stringer's coaches and teammates, establish that Stringer removed his helmet between drills even without a warning. (Def. Mot. Summ. J. p. 24, doc. # 53.) Defendants also point out that there is no evidence that Stringer would not have practiced on July 31 if Defendants' products contained a warning: the Vikings required Stringer to participate in training camp and Stringer had resisted his coaches' and trainers' efforts to remove him from practice the day before. *(Id.)*

Plaintiff's response is to note that, despite his reluctance, Stringer did in fact leave practice on July 30 when directed to do so by his coaches and trainers. Plaintiff also notes that Defendants' in-house counsel testified that Defendants intend that users of their products would comply with given warnings. Plaintiff then argues that, based on these two facts, a reasonable jury could infer that Stringer would not have practiced on July 31 had Defendants included heat-related warnings with the helmet and shoulder pads. (Pl. Resp. pp. 43–44, doc. # 80.)

Although inferences drawn from facts must be considered in the light most favorable to the nonmoving party on summary judgment, *see Matsushita Elec. Indus. Co.,* 475 U.S. at 587–88, 106 S.Ct. 1348, Plaintiff's argument is not tenable. The fact

**3.** When addressing this element of Plaintiff's failure to warn claim, both parties devote a substantial portion of their arguments to discussing whether or not the helmet and shoulder pads actually caused Stringer's heat stroke. (Def. Mot. Summ. J. pp. 20–23, doc. # 53; Pl. Resp. pp. 40–43, doc. # 80.) Those kinds of causation arguments, however, are more relevant to Plaintiff's design defect claim, not the failure to warn claim. Causation in the failure to warn context is concerned with whether a warning would have prevented the injury suffered by altering the product user's conduct. *See* 27 Minn. Prac., Products Liability Law § 4.11 (2008).

that Stringer left practice on July 30, reluctantly and only at the express direction of his coaches and trainers, does not support an inference that he would have outright refused to practice on July 31, in direct contravention of the demands of his coaches and the Vikings organization that required him to participate in training camp practices, if he had read a warning about the possibility of suffering a heat-related illness while wearing Defendants' products. The fact that Defendants intended that product users comply with given warnings does not say anything about what Stringer would have actually done in response to a given warning.

Plaintiff, in effect, is asking the court to find that a presumption exists that, as a matter of law, Stringer would have heeded a warning, not practiced on July 31, and thus not suffered a heat stroke. Some jurisdictions do recognize a rebuttable presumption that a product user will read and heed a warning, and when no warning is given the practical effect of this presumption is to relieve a plaintiff of the burden of proof on the issue of causation. *See Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 842–45 (8th Cir.2001) (collecting cases). Minnesota, however, has not adopted this presumption, *see Tuttle*, 377 F.3d at 925; *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 99–100 (Minn. 1987), and there is no reason to believe that Minnesota courts would adopt such a broad presumption in this case when the evidence presented indicates that Stringer would not have heeded any warning. The court thus declines to apply this presumption in this case. Plaintiff's arguments are entirely speculative, and there is no affirmative evidence that Stringer himself would have refrained from practicing on July 31 or otherwise altered his conduct and avoided the injury in response to a warning issued by Defendants. There is thus no genuine issue of material fact as to whether a warning would have changed Stringer's behavior.

### b. Whether a Warning Would Have Changed the Vikings' Trainers' and Coaches' Conduct

■ As to Defendants' second argument, however, the court agrees with Plaintiff that there is a genuine issue of material fact that precludes summary judgment. Defendants argue that the Vikings trainers and coaches already understood the risks surrounding heat-related illnesses, and that warnings on their products would not have added to the trainers' or coaches' knowledge or caused them to make different decisions about how the July 31 practice would have been conducted or whether Stringer would have been allowed to participate in it. (Def. Mot. Summ. J. pp. 33–34, doc. # 53.)

■ Plaintiff responds to Defendants' arguments by introducing the testimony and opinions of Dr. Michael Wogalter, a professor of psychology who specializes in warnings. Dr. Wogalter opines that an effective warning would be targeted at, among other groups, the Vikings trainers because they supervise and monitor the players (Dep. of Michael Wogalter p. 84, doc. # 75), and further states that an effective warning would communicate, among other things, "predictive information such as symptoms and signs, whether a person has had heat stroke or heat exhaustion in the past or the past day ... [because] having heat exhaustion the day prior is predictive of future heat stroke" (*id.* at p. 136). Medical evidence in the record does tend to establish that suffering an episode of heat exhaustion may predispose an individual to suffer another more serious heat related illness soon afterwards (*see* ex. 2C to Dep. of E.R. Eichner, doc. # 82), and Charles Barta, the Vikings head trainer who is primarily responsible for determining when players are able to practice or

return to practice after injury or illness, testified that he did not know this fact (Barta Dep. pp. 260, 330, doc. # 55). Barta testified that he never considered holding Stringer out of the July 31 practice or otherwise modifying his practice routine, and never warned Stringer about the increased risks associated with practicing a day after suffering a heat related illness. (*Id.* at pp. 256, 287.) Given that Dr. Wogalter's proposed warning would have alerted the Vikings trainers to this risk, it is reasonable to infer that the trainers would have taken steps to address it by monitoring Stringer more closely, by warning Stringer of the risk, by recommending modifying Stringer's practice routine, or by recommending that Stringer be held out of practice altogether. Given that the Vikings coaches nearly always followed Barta's recommendations about player health and when to allow players to practice (*id.* at p. 327), this would support a reasonable inference that alerting the trainers to the risk would have prevented or at least reduced the risk of Stringer suffering a heat stroke. A reasonable jury could thus find that the lack of an appropriate warning was the proximate cause of Stringer's injury.

Defendants have asked the court not to consider Dr. Wogalter's opinions, but the court is not persuaded by Defendants' arguments. Defendants simply argue that Dr. Wogalter's failure to draft a specific, word for word proposed warning and failure to test the efficacy of that warning means that his opinions should be excluded, and cite to *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076 (8th Cir.1999) and *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532 (7th Cir.2000).

In *Jaurequi* the plaintiff was injured by a mobile combine[4] and sued the manufac-turer for, among other causes of action, failure to warn. The plaintiff attempted to introduce expert testimony that the existing warnings on the combine were inadequate, but the district court excluded that testimony and granted summary judgment to the manufacturer. 173 F.3d at 1080–81. On appeal, the Eighth Circuit affirmed the exclusion of the expert testimony because both of the plaintiff's proffered experts admitted that they did not know what the original warnings had said, could not identify other manufacturers who used different warnings, and had not "created or even designed a warning device which would have been more appropriate, much less tested its effectiveness[,]" which made the reliability of their opinions questionable. *Id.* at 1084. More importantly, however, the Eighth Circuit held that the proffered expert testimony was irrelevant because the previous warnings had twice been painted over, and there was no basis for concluding that different warnings "would have escaped either painter's brush," which cut off all proximate causation. The Eighth Circuit held that "[t]hese breaks in the causal chain render any insufficiencies in the painted-over ... warning signs irrelevant" and affirmed the exclusion of the expert testimony. *Id.* at 1085.

*Bourelle* involved two plaintiffs injured in a warehouse when they were operating a stockpicker. The plaintiffs brought a products liability failure to warn claim and attempted to introduce expert testimony opining that the existing warnings on the stockpicker were inadequate, but the district court excluded the testimony and granted summary judgment to the manu-facturer. 220 F.3d at 533–34. The Seventh Circuit affirmed because the proposed expert could not even give a general

---

**4.** A combine is a piece of farm machinery that harvests and processes various types of crops.

*Jaurequi,* 173 F.3d at 1078.

idea of the language his alternate warning would incorporate, and his failure to draft an alternate warning made his opinion unreliable. *Id.* at 539.

Questions as to the admissibility of expert testimony are governed by Federal Rule of Evidence 702 and the Supreme Court's interpretation of that rule in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and later cases.[5] Rule 702 encourages courts to admit expert testimony by relaxing the traditional barriers to its admissibility, although the trial judge must still perform his or her "gatekeeper" function and screen proffered expert testimony. *See id.* at 588, 113 S.Ct. 2786; *see also Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir.2000). The *Daubert* Court, which addressed scientific expert testimony, set forth four factors relevant to the admissibility determination: whether the theory or technique can or has been tested, whether the theory or technique has been published and subjected to peer review, whether the technique has a high known or potential rate of error, and whether the theory or technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

The Supreme Court, in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), has held that the *Daubert* gatekeeping function applies to all expert testimony, not just scientific testimony, *see id.* at 147, 119 S.Ct. 1167, but stressed that the inquiry is a flexible one. While the enumerated *Daubert* factors will often be helpful in resolving the key question of the reliability of the expert's testimony, *id.* at 152, 119 S.Ct. 1167,

they are not a "definitive checklist or test" and "the gatekeeping inquiry must be tied to the facts of a particular case." *Id.* at 150, 119 S.Ct. 1167 (internal citations and quotations omitted). Not every factor will be applicable in every case, and "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153, 119 S.Ct. 1167. The court's central task is to make sure that the proffered expert testimony is reliable and relevant.

With this in mind, the court declines to exclude Dr. Wogalter's testimony. Defendants focus on the first *Daubert* factor—testing—but in this case that factor is not a reasonable measure of reliability. How, exactly, would Dr. Wogalter go about testing the efficacy of an alternative warning? Defendants offer no suggestions, and it is difficult for the court to conceive of a proper testing method. Nor is Defendants' complaint about Dr. Wogalter's failure to draft a word-for-word proposed warning persuasive: unlike the expert in *Bourelle* who could not even give the gist of a proposed warning, Dr. Wogalter has been reasonably specific in articulating what language and information would be in his proposed warning. (Wogalter Dep. pp. 135–36, doc. # 75 (warning should include 1) a sign word to attract attention; 2) either "heat exhaustion," "heat stroke," or "emergency medical condition" to describe the hazard; 3) consequences such as "serious injury," "death," or "brain injury;" and 4) instructions on how to avoid the hazard, such as removing the helmet when not in

---

5. Federal Rule of Evidence 702 reads: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

use and predictive information such as symptoms, signs, and the increased risk of suffering a heat stroke after suffering heat exhaustion or heat stroke within the past day or two).) Furthermore, unlike the proposed expert testimony in *Jaurequi* Dr. Wogalter's testimony is relevant to the issue of causation, as in this case there is no intervening act cutting off proximate causation. Defendants' arguments and reliance on *Jaurequi* and *Bourelle* are not well taken.

Dr. Wogalter testified that he reviewed and relied upon various depositions and numerous scholarly articles when forming his opinion in this case (*id.* at p. 10; Wogalter Expert Report pp. 1–2, doc. # 98), a technique for forming an expert opinion that is generally accepted. He also stated that he relied on his background, training, and experience, which includes extensive education in psychology, work experience developing warnings, numerous published articles, and giving prior expert testimony in state and federal courts. Forming an opinion and proposed warning based on such experience and training would be recognized as acceptable in the psychological community. The court concludes that the methods Dr. Wogalter employed to reach his opinion in this case are sufficiently reliable to permit admission of his testimony. Defendants' arguments about the lack of testing and specificity in language would more appropriately be raised on cross-examination. *See Finke v. Hunter's View. Ltd.*, 596 F.Supp.2d 1254, 1268–69 (D.Minn.2009) (where defendants objected to plaintiff's proposed expert on the grounds that she failed to prepare alternative warnings, court admitted testimony and stated that "[a]ny weaknesses in her opinions based on her ... lack of detail in describing a more adequate warning can be addressed during cross-examination").

### 3. Conclusion

Defendants had a duty to warn of the specific risk of developing heat stroke because it was not an obvious risk, and because the connection between Stringer's heat stroke and Defendants' failure to warn was not remote enough to preclude liability as a matter of law. Furthermore, genuine issues of material fact exist as to Defendants' sophisticated intermediary defense, and as to the issue of causation, i.e., whether a warning could have prompted the Vikings trainers to have changed their behavior and prevented Stringer's injury. Summary judgment is not appropriate on this claim.

### B. Design Defect

To establish a design defect products liability claim under Minnesota law, a plaintiff must show "(1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control; and (3) that the defect was the proximate cause of the injury sustained." *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 623 n. 3 (Minn. 1984). Although the parties dispute the first and third elements, the court finds that it need only consider the first.

Minnesota courts have adopted a "reasonable care balancing test" that governs the first element. *See Holm v. Sponco*, 324 N.W.2d 207, 212 (Minn.1982). Under this test,

a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use.

What constitutes "reasonable care" will, of course, vary with the surrounding

circumstances and will involve "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Id.* (*quoting Micallef v. Miehle Co.*, 39 N.Y.2d 376, 385–86, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976)). It is not enough to merely show that the product is capable of causing an injury because "the test is not whether a product is capable of producing injury, but whether a reasonable manufacturer would have designed the product in a different way to avoid a foreseeable risk of injury." *Holowaty v. McDonald's Corp.*, 10 F.Supp.2d 1078, 1083 n. 1 (D.Minn. 1998). This is an objective standard that "focuses on the conduct of the manufacturer in evaluating whether its choice of design struck an acceptable balance" between factors such as the likelihood and gravity of harm and the precautions necessary to prevent that harm. *Bilotta*, 346 N.W.2d at 621–22.

Defendants argue that Plaintiff's design defect claim fails because she has not introduced expert testimony (or any other testimony) establishing that a feasible, alternative safer design existed for Defendants' helmet and shoulder pads. Defendants argue that such testimony is essential to satisfying the first element of Plaintiff's claim, and that without it Plaintiff's claim fails as a matter of law. (Def. Mot. Summ. J. p. 29, doc. # 53.) Plaintiff argues that such evidence is not required under Minnesota law to establish the first element of her design defect claim, and urges the court to reject Defendants' argument and allow the jury "to determine, using the balancing test quoted above, whether these products were unreasonably dangerous for their intended or reasonably anticipated uses[.]" (Pl. Resp. p. 49, doc. # 80.)

In *Kallio v. Ford Motor Co.*, 407 N.W.2d 92 (Minn.1987), the Minnesota Supreme Court addressed the question of whether proof of an alternative, feasible safer design is required in design defect cases. The plaintiff was injured when his truck, which he had previously shifted into park, began rolling backwards and ran over his legs and one arm while he was attempting to cover the truck bed. The plaintiff argued that the truck's automatic transmission shifting mechanism was defectively designed because it had a propensity to fail to fully engage the park position, resulting in an "illusory park" where it appeared to the driver that the truck was in park when in reality the truck was not. The defendant requested a jury instruction stating that the plaintiff was required to introduce evidence of an alternative, feasible safer design for the shifting mechanism to prevail on his design defect claim, and also moved for a directed verdict on the ground that the plaintiff had not introduced such evidence. However, the trial court denied the motion for a directed verdict and declined to give the instruction, and the jury subsequently found in favor of the plaintiff. *Id.* at 94.

After the court of appeals rejected the defendant's arguments the Minnesota Supreme Court affirmed the trial court and upheld the jury's verdict, but with important qualifications. The Minnesota Supreme Court noted its adoption of the reasonable care balancing test in *Holm* but then reiterated that, unlike in other jurisdictions, in Minnesota one aspect of that test is the plaintiff's burden to establish *unreasonable* dangerousness, not just that the product was capable of producing injury. *Id.* at 95–96. The *Kallio* court then stated:

> Obviously, a factor bearing upon the [unreasonable dangerousness] requirement will be the existence or nonexistence of a feasible alternative design. . . . [P]laintiffs asserting a strict liability tort claim based upon alleged

defective design of a product ultimately have the burden to prove the elements of the asserted claim. Generally in a case based upon alleged improper design, one of those elements requires production of evidence that the design employed was unreasonably dangerous. To establish a prima facie case that it was unreasonably dangerous normally requires production of evidence of the existence of a feasible, alternative safer design.

*Id.* at 96. Although the Minnesota Supreme Court stated that proof of an alternative, feasible safer design was not strictly an element of a design defect claim and was not necessarily required in all cases, *id.* at 96–97, it also pointed out that "[e]xamination of our cases in which plaintiffs have asserted liability of a manufacturer based upon alleged defective design demonstrates that, as a practical matter, successful plaintiffs, almost without fail, introduce evidence of an alternative safer design[,]" *id.* at 96 n. 6. Only in the rare case in which a product is judged so dangerous that it should be removed from the market altogether, rather than redesigned, would a plaintiff not need to establish the existence of an alternative design. *Id.* at 97.

Importantly, the Minnesota Supreme Court pointed out that the plaintiff had in fact presented some evidence, "albeit weak," of the existence of an alternative, feasible safer design, which the defendant countered with evidence that no safer practical design existed. The *Kallio* court agreed with the trial court that the defendant's proposed instruction should not have been given and that the motion for a directed verdict was properly denied, but relied on the fact that the plaintiff in fact had offered some evidence of an alternative, feasible safer design, deferred to the jury's weighing of the plaintiff's and defendant's competing evidence and resolution of this disputed factual issue, and affirmed the trial court. *Id.*

Unreasonable dangerousness, not the existence of an alternative, feasible safer design, is the required element of a design defect claim, but *Kallio* makes it clear that presenting such evidence is effectively the only successful way to establish that a product is unreasonably dangerous.[6] Plaintiff has presented no evidence that an alternative feasible design exists that would make Defendants' helmets and shoulder pads safer with respect to heat-related illnesses. Plaintiff offers no evidence whatsoever, not even the "weak evidence" presented in *Kallio*, related to an alternative design for Defendants' shoulder pads. While there is some evidence in the record that other helmets incorporate air vents in the crown of the helmet to increase ventilation and, in theory, promote cooling (*see* Dep. of Thad Ide p. 74–5, 90–1, doc. # 87), Defendants have presented evidence that helmets with air vents are no cooler than helmets without such vents (Simbex Study p. 18–19, Dep. of Pope Moseley ex. 22, doc. # 94–3).[7] Plaintiff

---

**6.** There is no evidence or argument that Defendants' helmets and shoulder pads are so dangerous that they should be removed from the market altogether instead of being redesigned, and this is not one of the "rare cases" in which the *Kallio* court recognized that unreasonable dangerousness could be established without evidence of an alternative, safer design.

**7.** Plaintiff cites this study for its conclusion that the helmets' insulation inhibits natural cooling and that alternative methods of cooling should be considered (Pl. Resp. p. 20 n. 6, doc. # 80), but merely showing that the helmets are potentially dangerous because they inhibit cooling is not sufficient. Plaintiff must show that the helmets pose an unreasonable danger because they could be designed differently to reduce or eliminate that danger. *Holowaty*, 10 F.Supp.2d at 1083 n. 1.

has not rebutted this evidence, and thus, unlike *Kallio*, there is no evidence that an alternate, feasible design exists that would make Defendants' helmets safer.

Plaintiff's argument that the jury should be allowed to resolve the issue of unreasonable dangerousness by using the reasonable care balancing test articulated in *Holm* only helps to illustrate why evidence of an alternative, feasible safer design is so important to a plaintiff's claim in design defect cases. The reasonable care balancing test tasks the jury with "balancing the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Holm*, 324 N.W.2d at 212. While Plaintiff has produced some evidence pertaining to the first part of the balancing test, there is nothing for the jury to weigh that evidence against because there is no evidence as to what type and degree of burden developing effective precautions would impose on Defendants. Evidence of an existing alternative, feasible safer design would allow a jury to weigh the burden of adopting that alternative design against the likelihood and gravity of harm to determine if the manufacturer's design decision to not adopt the alternative design was reasonable. Without evidence of *how* Defendants could have designed the helmet and shoulder pads differently, how can the jury determine whether Defendants' design decisions were reasonable, i.e. whether Defendants *should* have designed the products differently?

Plaintiff would have the jury presume that the likelihood and gravity of harm posed by Defendants' helmet and shoulder pads would automatically outweigh any burden that might be imposed on Defendants by adopting different designs as precautions to avoid that harm. Plaintiff, however, cannot avoid her burden of proof in this way. Plaintiff has the burden of proof to present evidence sufficient to es-

tablish that the dangers posed by Defendants' products outweigh the burden of taking precautions against such dangers. This would establish that a reasonable manufacturer would have designed the products differently and that Defendants' products were unreasonably dangerous, which is the first element of Plaintiff's claim. In this case there is no evidence tending to show that Plaintiff could satisfy that burden at trial. Plaintiff cannot establish a genuine issue of material fact as to one of the required elements of her design defect claim, and summary judgment is appropriate for Defendants on Plaintiff's design defect claim.

### C. Implied Warranty

██ Plaintiff alleges that Defendants breached the implied warranty of merchantability because its helmet and shoulder pads were not fit for the ordinary purposes for which they were intended (Compl. ¶ 63, doc. # 1), but the court agrees with Defendants that "[s]trict products liability has effectively preempted implied warranty claims where personal injury is involved." *Masepohl v. American Tobacco Co. Inc.*, 974 F.Supp. 1245, 1253 (D.Minn.1997) (*quoting Nimeth v. Prest Equip. Co.*, No. C1–93–685, 1993 WL 328767 (Minn.Ct.App. Aug. 31, 1993)). The one case Plaintiff cites in response to Defendants' argument, *Bach v. Gehl*, No. A05–1843, 2006 WL 2865166 (Minn.Ct.App. Oct. 10, 2006), deals entirely with evidentiary objections and does not address the issue, and the court does not find it persuasive. Plaintiff's implied warranty claim is preempted by her products liability claims, and summary judgment for Defendants is appropriate on this claim.

### D. Express Warranty

██ Plaintiff's Complaint alleges that Defendants expressly warranted that the

helmet and shoulder pads were safe for their intended use. (Compl. ¶ 60, doc. # 1.) Defendants argue that creation of an express warranty requires an express affirmation of fact that becomes part of the bargain, and that there is no evidence that Defendants ever made an express affirmation of fact to Stringer or the Vikings about the safety of the helmet and shoulder pads. (Def. Mot. Summ. J. p. 40–41, doc. # 53.) Plaintiff has not responded to Defendants' arguments, and although the court cannot grant summary judgment simply because the opposing party has not responded, *see Carver v. Bunch,* 946 F.2d 451, 455 (6th Cir.1991), in this case the court finds that Defendants have satisfied their burden to show the absence of a genuine issue of material fact. Summary judgment is therefore appropriate for Defendants on Plaintiff's express warranty claim.

## IV. Conclusion

For the reasons stated above, the court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's design defect, implied warranty, and express warranty claims, but **DENIES** the Motion as to Plaintiff's failure to warn claim.

**IT IS SO ORDERED.**

### *MEMORANDUM OPINION AND ORDER*

On July 10, 2009, this court granted in part and denied in part Riddell's motion for summary judgment. It granted summary judgment in favor of Riddell on Plaintiff's claims of design defect and breach of warranty, leaving only Plaintiff's failure-to-warn claim for trial. This matter is currently before the court on Riddell's motion for partial reconsideration (Doc. 135) and Plaintiff's subsequent motion for leave to respond to Riddell's reply memorandum (Doc. 143). The relevant facts are set forth in this court's July 10,

2009 Memorandum Opinion and Order (Doc. 100) and will not be repeated here.

## I. Plaintiff's Motion for Leave to Respond

Plaintiff Kelci Stringer seeks leave to respond to Riddell's reply brief. She maintains that Riddell argued for the first time in its reply brief that because the Vikings' trainers and coaches were not physically injured, it is irrelevant whether an appropriate warning would have changed their behavior. But as Riddell accurately point out, this argument was *not* raised for the first time in its reply brief. In its motion for partial reconsideration, Riddell argued that the court erred in assuming that a manufacturer's duty to warn extends to non-injured non-users of its products. Moreover, Plaintiff has already responded to this argument. The court therefore **DENIES** Plaintiff's motion for leave to respond to Riddell's reply brief.

## II. Riddell's Motion for Partial Reconsideration

### A. Standard of Review

"District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tennessee Laborers Health & Welfare Fund,* 89 Fed. Appx. 949, 959 (6th Cir.2004) (citing *Mallory v. Eyrich,* 922 F.2d 1273, 1282 (6th Cir.1991)). Federal Rule of Civil Procedure 54(b) states, in pertinent part, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and

all the parties' rights and liabilities." Fed. R.Civ.P. 54(b).

The court has "significant discretion" in considering a motion to reconsider an interlocutory order. *See Rodriguez,* 89 Fed. Appx. at 959 n. 7. However, motions for reconsideration are not intended to be utilized to re-litigate arguments previously rejected by the court. *See Reed v. Islamic Republic of Iran,* 242 F.R.D. 125, 126 (D.D.C.2007). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez,* 89 Fed.Appx. at 959 (citing *Reich v. Hall Holding Co.,* 990 F.Supp. 955, 965 (N.D.Ohio 1998)).

## B. Discussion

Riddell maintains that this court committed clear error in holding that Riddell, as a matter of law, had a duty to warn of the risk of heat exhaustion and heat stroke, and in extending the duty to warn to non-injured, non-users of the products, i.e., the Vikings' trainers and coaches. "Clear error" is defined as a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Because the court finds nothing in its previous opinion that rises to that level, the court denies Riddell's motion for partial reconsideration.

### 1. Duty to Warn of Risk of Heat Exhaustion and Heat Stroke

#### a. The Relevant Risk

In its July 10, 2009 Memorandum Opinion and Order, the court held that, in determining whether Riddell had a duty to warn of the risks associated with using its equipment, the relevant risk was not the general risk of simply becoming hotter while wearing its equipment, but the more specific risk of developing heat exhaustion and heat stroke when wearing this equipment during extremely hot and humid conditions and while engaged in strenuous exercise. (Mem. Op. & Order at 688 – 89). The court concluded that because the danger of developing heat exhaustion and heat stroke under these circumstances was not obvious, and because it was reasonably foreseeable that a football player could suffer heat exhaustion and heat stroke while wearing the helmet and shoulder pads during extremely hot and humid conditions and while engaged in strenuous exercise, Riddell had a duty to warn as a matter of law. *See Germann v. F.L. Smithe Mach. Co.,* 395 N.W.2d 922, 924 (Minn.1986) (holding that the question of whether a manufacturer has a duty to warn is a question of law to be decided by the court).

In its motion for reconsideration, Riddell rehashes the same arguments the court previously rejected—that the only relevant risk is merely the risk of the football player getting hotter while wearing Riddell's equipment, and that because this risk is obvious, Riddell had no duty to warn. Riddell again relies on *Holowaty v. McDonald's Corporation,* 10 F.Supp.2d 1078 (D.Minn.1998), in which the plaintiff argued that McDonald's had a duty to warn of the dangers of spilling hot coffee because, although the risk of suffering minor burns was obvious, the risk of more serious burns was not. The district court rejected this argument, holding that "[a]n alleged difference in the anticipated degree of danger does not make the risk associated with the use of the product any less obvious." *Id.* at 1085. Riddell maintains that, like *Holowaty,* this case involves nothing more than a "difference in the anticipated degree of danger," and that the risk of developing heat exhaustion and heat stroke is simply an extension of the obvious risk of getting hotter.

The court rejects this reasoning for the same reasons previously discussed. As was the case in *Independent School District No. 14 v. AMPRO Corporation*, 361 N.W.2d 138, 143 (Minn.Ct.App.1985), the risk of developing heat exhaustion and heat stroke is "a different, more serious, and more unexpected danger" than merely the normal risk of getting hotter while wearing the equipment. A mere increase in body temperature while wearing this equipment in normal weather conditions, typically poses no significant risk of permanent physical damage because with rest and hydration, the body's temperature returns to normal. In contrast, wearing this equipment during extremely hot and humid conditions and while engaged in strenuous exercise poses a significant risk of heat exhaustion and heat stroke, serious illnesses that can cause major organ failure and even death, as it did in Stringer's case. This risk is clearly "different, more serious, and more unexpected" than the mere risk of getting hotter under normal weather conditions.

As the court previously explained, this case is more akin to *Gamradt v. Federal Laboratories, Inc.*, 380 F.3d 416 (8th Cir. 2004) (applying Minnesota law), in which the court held that even though it may have been obvious that detonation of a black smoke grenade would cause minor breathing discomfort, it was not obvious that a person exposed to the smoke in an enclosed space could lose 60% of his aerobic lung capacity. The court therefore concluded that knowledge of the mere danger associated with minor smoke inhalation did not relieve the manufacturer of the duty to warn about foreseeable dangers associated with the use of the grenade indoors. *Id.* at 420–21. Although *Holowaty* is legitimately argumentative, the facts of that case—including the product in question, the circumstances under which it was used, and the resulting damage—are radically different from those involved in the present case. Riddell, in short, has failed to demonstrate that the court committed clear error in relying on *Independent School District No. 14* and *Gamradt* in concluding that the relevant risk is the specific risk of developing heat exhaustion and heat stroke.

Riddell also argues that by defining the relevant risk as the risk of developing heat exhaustion and heat stroke, this court, in essence, held "that Minnesota law ... requires manufacturers to warn about *all possible circumstances* in which a common product may be used, and *all conceivable consequences* of that use." (Mot. for Reconsideration at 4) (emphasis added). This, of course, is not what the court held. As the court has explained, a duty to warn exists only if the injury was *reasonably* foreseeable. *See Balder v. Haley*, 399 N.W.2d 77, 81 (Minn.1987) (citing *Germann*, 395 N.W.2d at 924); *Westerberg v. School Dist. No. 792*, 276 Minn. 1, 148 N.W.2d 312, 317 (Minn.1967) ("The duty to warn rests on foreseeability."). For the reasons previously stated, the court has concluded that, based on the evidence presented, the specific risk of developing heat exhaustion and heat stroke was reasonably foreseeable and was not obvious. Riddell therefore had a duty to warn of that risk.

### b. Proper Analysis of the Duty Element

As noted above, the question of whether a manufacturer has a duty to warn is a question of law to be decided by the court. *Germann*, 395 N.W.2d at 924. This is what both parties previously argued and, accordingly, the court held that, because the risk of developing heat stroke was reasonably foreseeable and was not obvious, Riddell had a duty to warn as a matter of law. Riddell now argues, however, that the court committed clear error by making this determination prematurely. It maintains now that duty cannot be de-

termined as a matter of law unless fault and causation have already been established or are undisputed. With respect to these issues, the court has found genuine issues of material fact which preclude granting Riddell's motion for summary judgment.

In support of its argument, Riddell cites to the following language from *Germann:*

[i]n determining whether the duty exists, the court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists.

*Id.* In the court's view, this language simply means that if the injury suffered by the plaintiff was reasonably foreseeable, then the manufacturer has a duty to warn as a matter of law. If the injury was too remote to be reasonably foreseeable, then, as a matter of public policy, no duty should be imposed on the manufacturer. *See Foss v. Kincade*, 746 N.W.2d 912, 916 (Minn.Ct.App.2008).

Riddell, however, interprets this language in *Germann* to mean that, under Minnesota law, the test for the existence of a duty is actually the same as a test for proximate cause. Riddell now argues, for the first time, that, in the present case, until "but for" and "direct" causation have been established, the court cannot determine whether Riddell had any duty to warn of the dangers resulting from the use of its products.

Riddell's interpretation of *Germann* cannot be reconciled with fundamental, long-established, uniformly recognized legal doctrine. The inquiries concerning duty and proximate cause are completely separate. With respect to a duty to warn, the relevant question is whether the injury suffered by the plaintiff was reasonably foreseeable. In contrast, with respect to causation, the relevant question is whether the failure to warn was a substantial factor in bringing about the plaintiff's injury. *George v. Estate of Baker*, 724 N.W.2d 1, 10–11 (Minn.2006). As the Minnesota Supreme Court held in *Germann*, duty is a question of law to be determined by the court.[1] In contrast, the issues of "adequacy of the warning, breach of duty and causation" are questions of fact that *"remain* for jury resolution." *See* 395 N.W.2d at 924–25 (emphasis added). Unless the court finds that a duty exists, there is no need for a jury to reach the question of causation.

In a similar vein, Riddell also argues that because the connection between the alleged failure to warn and Stringer's death is so remote, the court should find an *absence of duty* as a matter of law. Riddell maintains that Stringer's heat stroke was the result of a culmination of numerous factors, the vast majority of which were beyond Riddell's control. This argument clearly goes to the question of a causation, not duty. As the court previously held, the *duty* to warn stems from the conclusion that it was reasonably foreseeable that a football player wearing Riddell's equipment in extremely hot, humid weather could develop heat exhaustion and heat stroke. In contrast, whether the *failure* to warn played a substantial part in bringing about Korey Stringer's death or

---

**1.** To the extent that Riddell's citations to W. Prosser, *Law of Torts* (4th ed. 1971), § 42, are at odds with the established law as set forth in later cases by the Minnesota Supreme Court, *e.g.*, in *Germann*, they are not persuasive authority.

whether his death was solely the result of other factors unrelated to Riddell's equipment, is a question of fact that must be determined by a jury. It is simply not relevant to the legal question of whether Riddell had a *duty* to warn.[2]

Because the court finds no clear error in its previous ruling, the court denies Riddell's motion for reconsideration with respect to the issue of duty.

## 2. Causation

In its July 10, 2009 Memorandum Opinion and Order, with respect to the issue of causation, the court held that there was no evidence that Korey Stringer would have changed his own conduct had Riddell included an appropriate warning. The court found, however, that genuine issues of material fact precluded summary judgment on the question of whether a warning would have altered the conduct of the Vikings' trainers and coaches and prevented Korey Stringer's death.

In its motion for reconsideration, Riddell argues that, under Minnesota law, the duty to warn extends only to "reasonably foreseeable users" of the product. *See Hauenstein v. Loctite Corp.,* 347 N.W.2d 272, 275 (Minn.1984); *Whiteford v. Yamaha Motor Corp., USA,* 582 N.W.2d 916, 919 (Minn.1998). Riddell maintains that since Korey Stringer was the end user of the equipment, and since the court has already found that a warning would not have changed Stringer's behavior, Plaintiff is unable to establish the requisite causation as a matter of law. Riddell argues that, in finding genuine issues of material fact concerning whether a warning would have prompted the Vikings' trainers and coaches to change their behavior and would have prevented Stringer's death, the court implicitly and erroneously extended

the duty to warn to non-injured non-users of the product.

The court rejects this line of reasoning. It is true that the duty to warn extends only to reasonably foreseeable users of the product. Moreover, an individual who suffers no injury has no standing to pursue a products liability claim. However, it does not follow that "non-injured non-users" can play no part in the causation analysis. If the manufacturer's failure to warn influenced the conduct of a third party, and that third party's acts or omissions were the proximate cause of the plaintiff's injury, then the manufacturer may be held liable. In fact, Riddell itself previously argued that causation could be established if a warning would have changed the behavior of either Korey Stringer *or* the Vikings' trainers and coaches. (Defs.' Mot. for Summ. J. 23–25; Defs.' Reply at 9).

Under Minnesota law, a third party's conduct is properly considered in determining causation where that party could have exercised control over the situation or acted to prevent injury. For example, in *Erickson v. American Honda Motor Co.,* 455 N.W.2d 74 (Minn.Ct.App.1990), the court upheld a jury verdict in favor of a 12–year old child who was injured when the ATV he was driving rolled over, causing severe head injuries. His aunt and uncle, who owned the vehicle, testified that if they had been warned of the dangers of operating the ATV, they would not have permitted their nephew to operate it. The court found sufficient evidence that the failure to warn was the proximate cause of the boy's injury. *Id.* at 78.

Likewise, where an employee is injured while using a product at work, Minnesota

---

**2.** The fact that the Vikings had a duty to maintain a safe workplace and may have been negligent in not taking more precautions to prevent Stringer's death does not absolve Riddell of its own duty to warn of the risk of heat exhaustion and heat stroke while using its equipment in extremely hot and humid conditions.

courts have held that a third party's conduct is both relevant and sufficient to establish causation on a failure-to-warn claim. In *Germann v. F.L. Smithe Machine Co.*, 381 N.W.2d 503 (Minn.Ct.App. 1986), *aff'd*, 395 N.W.2d 922 (Minn.1986), the plaintiff was an employee injured when his leg got caught in the hydraulic press. The press was designed to have a guard bar which would prevent this injury, but the bar was not properly attached at the time of the accident. The court of appeals, in upholding the jury's verdict for the plaintiff on the failure to warn claim, explained that sufficient causation evidence was presented because the jury could have inferred either that the plaintiff would have heeded the warning and not operated the machine without the guard bar, *or* that maintenance personnel would have heeded the warning and re-installed or checked the safety bar on the machine so as to prevent injury. *Id.* at 509.

In *Westbrock v. Marshalltown Manufacturing Co.*, 473 N.W.2d 352 (Minn.Ct.App. 1991), the employee plaintiff was injured while operating a mechanical punch press that he alleged lacked proper warnings. The trial court found that the plant manager would have ignored any additional manufacturer warnings, and concluded that plaintiff could not establish the requisite causation. The appellate court, however, noted that there was no evidence that the plaintiff would not have heeded additional warnings had they been provided. It therefore reversed the court's order rendering summary judgment in favor of the manufacturer on the failure-to-warn claim. *Id.* at 354, 359–60.

Implicit in these holdings is the fact that causation could be established by showing that an adequate warning would have altered the conduct of either the employee or the employer. These representative cases make it clear that causation may be established in a failure-to-warn case by showing that a non-injured, non-user would have altered his or her behavior in response to a warning, and that the change in behavior would have prevented the plaintiff's injury.

The two cases cited by Riddell in support of its argument that, under Minnesota law, product manufacturers have a duty to warn only foreseeable users of its products are not persuasive authority and are contrary to the Minnesota cases described above. In *Hauenstein v. Loctite Corporation*, 347 N.W.2d 272 (Minn.1984), plaintiff was injured while using a bottle of liquid adhesive owned by a service garage where plaintiff was repairing his automobile. The product was available only through industrial product distributors and was not purchased or owned by the plaintiff. The bottle in question contained no warnings, but the product had a history of safe use.[3] Over 200,000 bottles had been sold with no reports of user injuries. The issues in the case were submitted to the jury under two theories of liability, negligence and strict product liability. The jury returned a special verdict in which the manufacturer was found to be negligent but the product was found not to be in a defective condition. The jury also found that the defendant's negligence did not cause plaintiff's injury. The defendant argued that these findings were not inconsistent because the duty to warn under a strict product liability theory extends only to the ordinary user of the product while the duty to warn under a negligence theory extends to all foreseeable users. The Minnesota court rejected this distinction and held that the duty to warn extended to all foreseeable users, including the plaintiff in that case who was

---

**3.** Likewise, in the instant case, Riddell notes that Korey Stringer was the first professional football player to die of heat stroke while using Riddell's equipment.

**705**

not the owner or even the ordinary commercial user of the product.

In *Whiteford v. Yamaha Motor Corporation,* 582 N.W.2d 916 (Minn.1998), plaintiff, a five-year-old boy, was injured when his toboggan collided with a stationary Yamaha snowmobile parked at the bottom of the hill. The court found that the defendant manufacturer was not required to anticipate or protect against this type of risk.

Both cases are clearly distinguishable from the present case, and neither involved the question of whether causation can be established in a failure-to-warn case by showing that a non-injured, non-user would have conducted himself in such a manner so as to prevent injury if proper warnings had been given about the product. The *Erickson, Germann* and *Westbrock* cases cited above did involve this question and were decided in a manner contrary to Riddell's argument.

In this case, the Vikings purchased Riddell's helmets and shoulder pads for the players, and the coaches and trainers exercised control over how these products would be used. They dictated when the equipment would be worn and what the players were required to do during the practice sessions. The court has already determined that genuine issues of material fact exist concerning whether a warning would have altered the conduct of the Vikings' coaches and trainers. Based on the evidence presented, a reasonable jury could find that the lack of warning played a substantial part in bringing about Korey Stringer's death.[4] It is irrelevant to the causation analysis that the coaches and trainers were non-injured, non-users.

For these reasons, the court finds no clear error in its previous ruling with respect to the issue of causation.

## III. Conclusion

For the reasons set forth above, the court **DENIES** Plaintiff's motion for leave to respond to Riddell's reply brief (Doc. 143). Because Riddell has failed to show that the court committed clear error, Riddell's motion for partial reconsideration (Doc. 135) of the July 10, 2009 Memorandum Opinion and Order is also **DENIED.**

**IT IS SO ORDERED.**

---

4. With an adequate warning, the coaches and trainers may have taken more precautions to prevent heat-related illnesses. They may have allowed the players to practice without the equipment, may have conducted less strenuous drills, or shortened the length of the practice sessions. They may have been more attentive to the symptoms of heat stroke that Korey Stringer was experiencing, pulled him from practice, and sought emergency medical assistance in a more timely fashion.